[Cite as *In re C.E.*, 2009-Ohio-6027.]

### IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

---

**IN THE MATTER OF:**

    C.E.

**CASE NO.  5-09-02**

**ALLEGED NEGLECTED AND
DEPENDENT CHILD,**

    **O P I N I O N**

    [AMBER WATSON, APPELLANT,
ROBERT ESSEX, APPELLANT].

---

**IN THE MATTER OF:**

    L.W.

**CASE NO.  5-09-03**

**ALLEGED NEGLECTED AND
DEPENDENT CHILD,**

    **O P I N I O N**

    [AMBER WATSON, APPELLANT,
ROBERT ESSEX, APPELLANT].

---

**Appeal from Hancock County Common Pleas Court
Trial Court No. 20630033, 20730033**

**Judgment Affirmed in Part and Reversed in Part**

**Date of Decision:    November 16, 2009**

---

Case No. 5-09-02, 5-09-03

**APPEARANCES:**

*Drew J. Mihalik* **for Appellant Essex**

*Charles R. Hall, Jr.* **for Appellant Watson**

*Kristen K. Johnson* **for Appellee**

*Barbara Dibble* **for CASA**

**WILLAMOWSKI, J.**

{¶1} This appeal is brought by parent-appellants Amber and Robert from the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, terminating parental rights and awarding permanent custody to the Hancock County Job and Family Services – Children's Protective Services Unit ("the Agency"). For the reasons set forth below, the judgment is affirmed in part and reversed in part.

{¶2} On August 30, 2006, the elder half-sister of the children at issue in this case, C.H., was found wandering unattended in a parking lot. C.H. was three years of age at the time and was dirty and hungry. C.H. was eventually identified and taken home by officers from the Findlay Police Department. At the home, the officers found C.E., who was born on June 13, 2006, being cared for by Amber's

uncle. The home was determined to be unfit for children. Soon after, Amber arrived home and began to argue with the officers. While holding C.E., Amber began a physical struggle with the officers. Both C.H. and C.E. were removed from the home that day.

{¶3} On August 31, 2006, the Agency filed a complaint alleging that C.H. and C.E. were neglected and dependent children. An emergency hearing was held on September 1, 2006. On September 6, 2006, the trial court entered judgment finding probable cause for the removal of the children and placing them in the emergency temporary custody of the Agency. On September 15, 2006, the trial court appointed Don Schmidt ("Schmidt") as the guardian ad litem in this case. The adjudicatory hearing was held on October 5, 2006. Amber admitted to the allegations in the complaint at the hearing. The trial court accepted her admissions and found the children to be neglected and dependent. The dispositional hearing was held on November 9, 2006. On November 14, 2006, the trial court awarded temporary custody of both C.H. and C.E. to the Agency. On November 20, 2006, the Agency filed the first case plan.[1] The case plan required Amber to do the following: 1) maintain a safe and stable living environment; 2) obtain a mental health and substance abuse assessment and then follow the recommendations; 3) participate in parental education and other recommended related services; and 4)

---

[1] The case plan also included recommendations for C.H.'s father. However, C.H. is not involved in this appeal as custody was awarded to her father. Thus, these recommendations will not be discussed.

complete a life skills class. The case plan required Robert, and his wife, to 1) establish paternity of C.E.; 2) obtain a mental health and substance abuse assessment and then follow the recommendations; and 3) complete a community services assessment. The case plan was approved by the trial court on December 5, 2006.

{¶4} On February 23, 2007, the semi-annual review of the case plan was filed. During the review, the following progress or lack thereof was noted: 1) Amber remained without stable and safe housing; 2) Amber completed her evaluations, but mental health services were still needed; 3) Amber continues to resist the education offered by the Agency; 4) Amber participated in the Life Skills classes, but still needs additional services; 5) Robert is objecting to the mental health and substance abuse evaluations as illegal and prejudicial; and 6) a DNA test to establish Robert as C.E.'s father was scheduled for March 1, 2007. Following the review, it was recommended that the children remain in the Agency's temporary custody.

{¶5} On June 27, 2007, Robert filed a motion for unsupervised visitation with C.E.. Robert based his motion on the fact that he was not involved in any of the underlying reasons for the removal of C.E. from Amber's home. On July 12, 2007, the Agency filed a motion for a six month extension of temporary custody. Schmidt filed his review report on August 3, 2007. In the report, Schmidt noted

that Amber was making some progress and that Robert was feeling frustrated with the process. Schmidt also noted that he was still concerned with Amber's lack of income, the fact that Amber was expecting another child soon, that Robert was not utilizing his full visitation with C.E., and that Amber still needs to participate in more life skills educational classes. On August 7, 2007, Amber filed a motion to allow her unsupervised visits with her children. In support of this motion, Amber attached the certificates of completion for the following classes: 1) Keys to Caregiving Parent Training; 2) Living Skills Program; 3) Getting It All Together – "Stress and Time Management with Little Ones" Parenting Infants and Toddlers Series; and 4) Good Beginnings – "Play and Toys" Parenting Infants and Toddlers Series. A hearing was held on all these motions on August 9, 2007. Amber withdrew her motion for unsupervised visits at the hearing. Robert's motion was taken under consideration. The trial court granted the Agency's motion for a six month extension of temporary custody. Robert's motion was subsequently denied on August 16, 2007

{¶6} On August 16, 2007, the second semi-annual review of the case plan was held. The review noted that Amber had obtained housing, and had completed the life skills class. However, Amber was still receiving individual education on life skills, needed psychological evaluation, and needed additional parent education as her expectations of the children were unrealistic. The review further

stated that Robert had completed his psychological evaluation and was recommended for individual counseling, but declined. No requirement for individual counseling for Robert appeared in subsequent case plans. Robert's wife had her evaluation scheduled, but the results were not yet available. An amended case plan was filed on September 4, 2007. The new plan required Amber to receive a psychological evaluation and participate in play therapy with C.H. Robert and his wife were required to complete a psychological evaluation as well and to participate in parent education regarding toddler care. In addition, Amber was required to continue her life skills and parental educational training. The trial court approved the amended case plan on September 14, 2007.

{¶7} On September 16, 2007, L.W. was born to Amber.[2] The trial court granted an ex parte order removing L.W. from Amber on September 17, 2007. The decision was based upon the fact that C.H. and C.E. had been adjudicated as neglected and dependent and they still were in the temporary custody of the Agency. The emergency hearing was held on September 18, 2007. The trial court found probable cause for the removal and placed L.W. in the emergency temporary care of the Agency. On September 19, 2007, Schmidt was named the GAL of L.W. as well as the other children. The adjudicatory hearing concerning L.W. was held on October 11, 2007. The trial court found L.W. to be a dependent

---

[2] The father of L.W. was unknown at that time.

child and L.W. was added to the case plan.[3]  Robert was subsequently determined to be the father of L.W. as well as C.E..  A dispositional hearing was held on November 28, 2007.  Following the hearing, the trial court granted temporary custody of L.W. to the Agency.

{¶8}  On January 8, 2008, the Agency filed motions for permanent custody of all three children.  The motion for L.W. alleged that it would be in his best interest for parental rights to be terminated because the parents have repeatedly failed to remedy the problems causing removal, have chronic mental illness, and have failed to demonstrate a commitment to the child.  The motions for C.H. and C.E. indicated that the children had been in the temporary custody of the Agency for more than fifteen months as well as all the reasons set forth in the motion for permanent custody of L.W..  On February 19, 2008, Amber filed a motion for a second psychological evaluation.  This motion was granted on that same day.

{¶9}  The third semi-annual review was conducted on February 7, 2008. The Agency noted that Amber had maintained her housing since June 2007, and was working on the classes and therapy requested.  However, the Agency was concerned by the fact that Amber was unemployed, had quit school, had been receiving parent educator services since she was fourteen yet still was having

---

[3]  The amended case plan also included services for C.H.'s father.

issues with her parenting skills.[4]  The Agency also said that Robert chose not to comply with the requested therapy[5] due to his belief that it was unnecessary. Robert attended visits regularly, but usually left half way through while his wife only attended a few visitations.  The reason for the early departure was claimed to be Linda's work schedule, so the visits were changed from one two hour visit a week to two one hour visits per week.

{¶10} On June 26, 2008, a pretrial was held on the motions for permanent custody.  Amber moved for a continuation on the motion and no objections were made.  Thus, the trial court granted the continuance until September 2008.  A fourth semi-annual review was then held on August 7, 2008.  The review noted that Amber still had issues with her parenting skills and that there was concern about her mental health.  The review also noted concerns that Robert was using opiates outside doctor recommendations.  Due to these concerns, the Agency determined that there were safety issues in returning the children to either Amber or Robert at that time.  The trial court then granted Robert's request for a second psychological evaluation.  Due to the second examination, the hearing was again continued and was rescheduled for January 7, 8, and 9, 2009.

{¶11} On September 24, 2008, Robert moved for extended and

---

[4]  At the time of the third review, Amber was twenty years of age.
[5]  The mentioned therapy was a recommendation of Dr. Connell and was never required in any subsequent case plan.

unsupervised visitation with C.E. and L.W. The trial court granted the motion on November 7, 2008. The visits were extended to two hours, twice a week. The visits were allowed to be unsupervised as long as Robert stayed at the visits for the full two hours for four consecutive weeks and fully cooperated with the Agency. On December 11, 2008, the second psychological evaluations of Amber and Robert were filed. Robert then filed a motion for custody of C.E. and L.W. on December 12, 2008. The trial court then granted Robert unsupervised overnight visits with the boys as of December 18, 2008. On December 29, 2008, Schmidt filed his GAL report. Schmidt recommended that permanent custody of C.E. and L.W. should be granted to the Agency.[6]

{¶12} On December 29, 2008, the Agency filed an amended motion for permanent custody of C.H., C.E., and L.W.. The basis for the amended motion was 1) that the children had been in the custody of the Agency for more than twelve months of a consecutive 22 month period, 2)Amber and Robert had failed to remedy the problems causing the removal of the children from the home, 3) chronic mental illness, physical disability, or chemical dependency of a parent so severe that it makes the parent unable to provide an adequate home within one year of the hearing, and 4) that Amber and Robert were unwilling to provide the basic necessities for the children or prevent neglect. The hearing on Robert's

---

[6] The recommendation for C.H. was that her father be granted custody of her.

motion for custody and the Agency's amended motion for permanent custody was held on January 5, 7, and 8, 2009. At the conclusion the trial court took the motions under advisement. On January 16, 2009, the trial court entered its judgment granting the motion for permanent custody of C.E. and L.W. to the Agency and denying Robert's motion for custody.[7] Amber and Robert both appeal from this judgment. Amber raises the following assignments of error.

## First Assignment of Error

**[The Agency] failed its duty to use reasonable case planning and diligent efforts at reunification with the parent.**

## Second Assignment of Error

**The trial court's decision to terminate [Amber's] parental rights and grant permanent custody to the [Agency] is against the manifest weight of the evidence.**

## Third Assignment of Error

**The trial court erred in granting permanent custody for the children because it was not in their best interest.**

## Fourth Assignment of Error

**The trial court erred by not making a finding on the record as to the wishes of the children and not appointing them separate counsel.**

## Fifth Assignment of Error

**The trial court erred in granting permanent custody for the children because [Amber] lack[s] affluency.**

---

[7] The trial court granted the motion for custody of C.H.'s father.

{¶13} Robert raises the following assignments of error.

**First Assignment of Error**

**The lower court erred in granting permanent custody of C.E. and L.W. to [the Agency] because the case plan implemented by the Agency was not reasonably calculated to succeed in reunifying the two boys with their biological father, [Robert].**

**Second Assignment of Error**

**The lower court's decision to terminate [Robert's] parental rights and grant permanent custody to [the Agency] and deny [Robert's] motion for custody is not supported by sufficient evidence and/or is against the manifest weight of the evidence.**

{¶14} The right to raise one's own child is a basic and essential civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 556 N.E.2d 1169. "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include in pertinent part as follows.

**(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child**

**to the agency that filed the motion for permanent custody and that any of the following apply:**

**\* \* \***

**(d)    The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**

**For the purpose of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from home.**

**(2)    With respect to a motion made pursuant to [R.C. 2151.413(D)(1)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C)    In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

**\* \***

**(D)(1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \*, the court shall consider all relevant factors, including, but not limited to, the following:**

**(a)   The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;**

**(d)     The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)     Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

**\* \* \***

**(E)   In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.   If the court determines by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(1)     Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be**

-13-

**placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2)   Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated within one year after the court holds the hearing pursuant to division (A) of this section * * *;**

**\* \* \***

**(4)   The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

**\* \***

**(16) Any other factor the court considers relevant.**

R.C. 2151.414.

{¶15} Amber's first assignment of error alleges that the Agency failed to use reasonable case planning and make diligent efforts to reunite the children with her.  Case plans are tools that the Agency uses to set forth the goals of the parents to allow for the return of the children to their parents.  *Leveck*, supra at ¶10. These plans must take into consideration the individual circumstances of each case, including the abilities of the parents and the children.  Id.  "Nevertheless, the

issue is not whether there was anything more that [the Agency] could have done, but whether the [Agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." Id.

{¶16} In this case, the children were removed from the home when CH was found wandering the parking lot, dirty, hungry, and unattended. The Agency investigated and the home was found to be filthy and unfit for the children to remain. In response to these problems, the Agency's case plan required Amber to 1) obtain additional parenting knowledge and skills; 2) obtain mental health and substance abuse assessments; 3) obtain a more detailed psychological evaluation; and 4) obtain safe and stable housing. The case plan included requirements that Amber comply with the recommendations of the evaluations. The terms of the case plan were reasonably calculated to remedy the reasons for the removal of the children from the home. Thus, the trial court did not err in finding that the Agency had made reasonable case planning and made diligent efforts to return the children to Amber. Her first assignment of error is overruled.

{¶17} Amber's second assignment of error is that the judgment terminating her parental rights was against the manifest weight of the evidence. If a child has been in the temporary custody for twelve of twenty-two consecutive months, the trial court may terminate parental rights if it finds that doing so is in the best interest of the child. R.C. 2151.414(B)(1)(d). The time begins to run

whenever the child is adjudicated pursuant to R.C. 2151.28 or 60 days after the child is removed from the home, whichever is earlier. Id. However, only the time between the start date and the date of the filing by the Agency of the motion for permanent custody is to be considered by the trial court. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176. "In other words, the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." Id. at ¶26.

{¶18} In this case, C.E. was adjudicated a neglected and dependent child on October 5, 2006. L.W. was adjudicated a dependent child on October 11, 2007. A motion for permanent custody was filed for both boys on January 8, 2008. At that time, C.E. had been in the temporary custody for more than twelve of twenty-two consecutive months. The trial court's findings to this effect are supported by the evidence. Thus, the trial court did not need to determine whether C.E. could be returned to Amber within a reasonable time, only if termination of parental rights would be in his best interest. Id. at ¶21. However, at the time the motion was filed and the time for determination of the twelve month period was established, only three months had passed since L.W. had been adjudicated a dependent child. The Agency filed an amended motion alleging that the twelve month period had been met on December 29, 2008. Since this

motion is an amendment and not a new motion, it relates back in time to the original filing.[8] Civ.R. 15(C). The time between the filing of the motion and the hearing cannot be counted in the time calculation. *In re Arnold*, 3d Dist. No. 1-04-71, 1-04-72, 1-04-73, 2005-Ohio-1418, ¶10. The trial court must thus make additional findings before terminating parental rights to L.W.

{¶19} In determining whether to terminate Amber's parental rights, the trial court made the following findings as to both C.E. and L.W.

> **[Amber] has been diagnosed as having "Developmental Disorder Not Otherwise Specified, Major Depression, Recurrent; Bipolar Disorder and Post-traumatic Stress Disorder". Doctors have stressed the importance of [Amber] maintaining a medication regimen for the Bipolar Disorder but she has been noncompliant. [Amber] did complete the life skills group but only minimal progress was noted and she was unable to demonstrate any change in her parenting skills. Therapist Peg Wood recommended that [Amber] attend the "Personality Skills Group" but she refused. It was also recommended that she attend the "Mind over Mood Group" and she only attended once. Becky Shoemaker, the parent educator for [the Agency] worked with [Amber] for an extended period of time over several years. Following hours of intensive work with the mother, Shoemaker opined that [Amber] could not parent any of her children either together or individually.**
>
> **\* \* \***
>
> **Dr. Connell describes the mother as having significant deficits in cognitive, interpersonal, and emotional functioning which impairs her ability to effectively parent her children. He further goes on to opine that it is unlikely that she will ever be**

---

[8] This court notes that only seven days had elapsed between the amended motion and the hearing date. Thus, if this would have been a new motion, the hearing would have been held before the response time had expired. This potentially would have been a due process problem.

> **able to function independently as a parent to any of her three children. He continues that she has been involved in some form of parent education for the past six year (sic), but has failed to exhibit the judgment and decision making essential for effective parenting.**

Jan. 16, 2009, J.E., 4-5. These findings are supported by the record. The findings indicate that Amber suffers from chronic mental illness and lacks the ability to provide a stable and safe home for the children. Thus, pursuant to R.C. 2141.414(E)(2)(4), there is a reasonable basis for determining that the children cannot be placed with Amber within a reasonable time. Amber's second assignment of error is overruled.

{¶20} In the third assignment of error, Amber claims that the trial court's judgment is not in the best interest of the children. The trial court must consider the factors set forth in R.C. 2141.414(D) when determining what is in the best interest of the children. The trial court's determination must be supported by clear and convincing evidence. *In re M.E.*, 8th Dist. No. 86274, 2006-Ohio-1837, ¶9. The trial court in this case stated that it had considered the statutory factors. J.E., 4. The trial court based its determination upon the report of Dr. Connell, which was entered into evidence. Thus, the findings were supported by competent, credible evidence. The trial court did not err in determining that termination of Amber's parental rights was in the best interest of the children. Therefore, the third assignment of error is overruled.

{¶21} Amber's fourth assignment of error alleges that the trial court erred by failing to make a finding concerning the wishes of the children or by failing to appoint separate counsel for the children. Amber relies upon an Ohio Supreme Court opinion holding that it may be necessary to appoint separate counsel for a minor if his or her wishes contradict those of the guardian ad litem. *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110. This court agrees with the holding in *Williams*. However, that holding does not apply in this case. Here, the children in question are toddlers and are not capable of understanding the proceedings or making their wishes known. The trial court correctly considered the maturity level of the children and determined that they could not make their wishes known. Since the children cannot express their wishes, they did not conflict with the recommendation of the guardian ad litem. Thus no appointment of separate counsel was necessary. The fourth assignment of error is overruled.

{¶22} In her final assignment of error, Amber claims that her parental rights were terminated because she lacked finances. The law does not permit the termination of parental rights simply because other parents would be better able to provide for the child. *In re Alexis K.*, 160 Ohio App.3d 32, 2005-Ohio-1380, ¶22, 825 N.E.2d 1148. "Only where there is a 'demonstrated incapacity or something akin to criminal neglect that the law is justified in interfering with the natural

relations of parent and child.'" Id. citing *In re Konneker* (1929), 30 Ohio App. 502, 511, 165 N.E. 850. Although Amber's lack of financial resources may have hindered her ability to find suitable housing for her children, this was not the reason the trial court terminated her parental rights. The trial court instead focused on her mental health and seeming inability to apply the parenting skills she learned in her classes. The judgment entry does not indicate that the trial court's judgment is based upon her lack of finances in any way. Thus, Amber's fifth assignment of error is overruled.

{¶23} Robert's first assignment of error alleges that the Agency's case plan was not reasonably calculated to reunite the children with him. His second assignment of error claims that the judgment terminating his parental rights was against the manifest weight of the evidence. Since these two assignments are interrelated, they will be addressed concurrently. The case plans set forth four objectives for Robert and Linda: 1) complete a psychological evaluation; 2) obtain additional parenting knowledge and skills; 3) possibly obtain community services; and 4) obtain mental health and substance abuse assessments. This court notes that the second and third objectives for Robert and Linda were eventually dismissed by the Agency as not necessary. The first and fourth objectives were eventually completed by the parties.

{¶24} The first objective was to complete a psychological evaluation. Robert and Linda were both evaluated by Dr. David Connell. Robert then received a second evaluation by Dr. Patrick. April Allison, the second case worker in this matter, testified that Robert had completed this objective, even though he had objected to being subjected to the evaluation. Tr. 500. She believed that Robert was angry with the process and did not understand why he was not given his sons when they were removed from Amber's home.[9]

{¶25} Robert did attend all of the psychological evaluation appointments and no diagnosis of mental health issues were found.[10] At trial, Dr. Connell testified that given what he had previously seen, he would not grant Robert custody of the children. Tr. 103. However, he also testified that this opinion could change as he had not observed Robert with the children or read records concerning the interaction of Robert with the children. Tr. 126, 136. Dr. Connell testified that if Robert had a history of healthy visits, counseling, and drug testing for a possible drug problem, Robert could effectively parent the children. Tr. 137. Noticeably, although the social workers and Dr. Connell testified that the children should not be placed with Robert, they did not testify that the children would be in danger of abuse or neglect if placed with Robert. Instead, they focused on his

---

[9] The children have never resided in Robert's home. They were removed from Amber's home and no allegation has ever been made that Robert's home is inappropriate.

[10] Dr. Connell testified that he believed that Robert was deceitful, self-centered, and may have a drug problem. However, Dr. Connell did not state that he found any mental illness.

inappropriate relationship with the much younger Amber, while being married to Linda, and possible drug problem.

**{¶26}** Dr. Carol Patrick conducted the second psychological evaluation on Robert. Contrary to Dr. Connell, Dr. Patrick found Robert to be very cooperative and saw no indication of drug abuse. Tr. 154-56. She found that the successful unsupervised overnight visits were indicative of Robert's ability to effectively parent the children and had no concerns of abuse or neglect. Tr. 158, 197-98.

**{¶27}** The fourth objective was to obtain a mental health and substance abuse evaluation. April Allison, the caseworker from June 2007 until August 2008, testified that Robert was referred to Firelands for these assessments and that the assessments had been completed. Tr. 513. No follow up treatment was recommended by Firelands. Tr. 514. Her personal opinion was that Linda and Robert both needed additional mental health counseling, such as marital counseling. Tr. 514-15. She also believed that Robert has a drug problem due to his having been convicted of a drug offense in the 1980's in Pennsylvania and a positive drug screen.[11] Tr. 516. However, Dr. Connell's independent testing of hair follicle came back negative for marijuana, amphetamines, methamphetamines, opiates, ecstasy, cocaine, and PCP. CPSU Exhibit 3. Robert denied all use of illegal drugs or drug abuse.

---

[11] Robert tested positive for Dilaudid and barbituates in 2008. He tested negative for Percocet for which he had a prescription. He had no prescription for Dilaudid, which is a pain killer stronger than Percocet.

{¶28} At the trial, the testimony was focused less on Robert's parenting abilities and more on his attitude toward the Agency. The relationship between Robert and the Agency was clearly a combative one. The case workers were primarily concerned with the inappropriateness of the affair between Robert, a sixty-something married man, and Amber an 18 year old woman. The testimony indicated that the case workers suggested that Linda and Robert should seek marital counseling, they were concerned that Linda was going to leave Robert, that Robert was too old or sick to care for the children, and that Robert was denying a drug problem. Because of his drug related conviction more than two decades ago, the case workers contended that Robert must have a drug abuse problem despite his denials and two drug tests which were both negative for illegal and unauthorized prescription drugs.[12] The case plan had required a mental health and substance abuse assessment and further required that Robert and Linda follow the recommendations. Robert and Linda had the assessments and no further services were recommended by the assessors. Although, the case workers claimed to continue to have concerns, they did nothing to address them after the assessment. April Allison believed that Robert and Linda needed marital counseling, but never made it part of any case plan. April testified that she had

---

[12] Dr. Connell administered a hair follicle test. Firelands also did a drug screen that came back positive for opiates, which they credited to authorized use of Percocet.

concerns and told Robert they should consider counseling, but that was the extent of her involvement.

{¶29} Then Kimberly Freetag-Shope, the CASA case manager, testified that within the two weeks prior to the trial, she had observed Robert and Linda in their home caring for the boys. She testified that she saw an appropriate family and that Linda had a positive attitude about her marriage and raising the boys. Tr. 308. Linda herself testified that although she had many misgivings at the beginning and was very angry with Robert for his affair, they had worked through those issues. She testified that she intended to remain in her marriage and that she desired to have the boys join their family. Tr. 329. She also testified that she would treat the boys as her own and that her daughter has accepted her brothers and enjoys having them in the home. Tr. 329, 352. As for the drug abuse question, no additional tests were ever requested and no additional services were required. The Agency's claim of concern about potential drug abuse is belied by the fact that it was not further addressed by the case plan.

{¶30} The Agency also never requested medical records to determine the status of Robert's health. In fact, the only direct testimony about whether Robert's health limited his ability to parent was that of Kimberly Freetag-Shope. She observed Robert in his home playing with the boys. She testified that the home was appropriate, Robert and Linda's interactions with the boys were

appropriate, and that she saw no physical limitations on Robert's ability to care for the children. Tr. 305-314. Linda testified that any of Robert's health problems did not impact his ability to parent the boys. Tr. 323. She also testified that although she and Robert smoke, they have limited the smoking to the garage so as to not trigger the boys' asthma. Tr. 346. This claim was confirmed by Kimberly Freetag-Shope's testimony that there was no smell of smoke in the home when she visited. Tr. 311. Linda also testified that she and Robert would quit smoking if instructed to do so by the court. Tr. 356.

{¶31} Neal Schroeder, the Harmony House Case Manager testified that although Robert's visits were initially sporadic and short, Robert has improved. During his visits, there were no problems with how Robert parented the children. Tr. 397. Any issues had to do with rule violations, such as forgetting to turn off a cell phone. Tr. 400. Prior to the hearing, Robert had progressed from supervised visits of two hours per week to four hours per week to unsupervised visits, to overnight unsupervised visits. Robert had even had a face to face visit with the foster parents at a transfer to discuss the boys medical conditions. This visit was uneventful and Robert was attentive to what the foster parents told him. Tr. 410. The GAL recommended granting the Agency permanent custody of the children, but also testified that if the trial court were to find Robert capable of parenting, he should be granted custody. Tr. 784, 791.

{¶32} In reaching its decision, the trial court based its decision primarily on the mere speculation of the case workers and Dr. Connell.

> **In particular this court is concerned regarding the relationship between the child's natural parents. The father is [Robert], age 62. The mother is [Amber], age 21, who has a third child in the custody of the child's biological father. The two children who are the subject of this case were conceived and born while [Robert] was living with his wife of 17 years. * * * [Robert's] current narcotic drug usage is unclear as is his entire life history. It is known that [Robert] served several years in prison in 1987 after pleading guilty to four counts of Intent to Deliver Heroin.**

J.E. 3. Although these facts may be offensive to many people, they do not affect one's current ability to parent a child. The fact that Robert had an affair which resulted in the birth of these children may mean he was a lousy husband, but does not have any bearing on his ability to parent. Likewise, a conviction more than 20 years ago for which the sentence is complete and no other instances of legal trouble is also irrelevant to whether Robert can effectively parent the children. Also irrelevant is Robert's health since no one ever testified that it would interfere with his ability to parent the children. There was merely speculation that it might someday. Most noteworthy is that not one of the Agency's witnesses testified that the children would be in any danger of neglect, abuse, or dependency if returned to Robert. All of the case workers and the GAL testified that Robert's home was physically appropriate for the children. The sole issue was whether Robert could parent the children. However, the Agency made no effort to insure that all of the

speculative concerns about Robert, which formed the basis of the Agency's case against Robert, were addressed in any case plan. Robert did everything he was required to do and complied with the requirements set by the trial court in order to obtain more visitation. He successfully met the goals set by the trial court and at the time of the hearing had progressed to unsupervised overnight visits.

{¶33} Based upon the evidence in the record, the Agency did not make a good faith effort to provide a case plan which would result in the reunification of Robert with his sons. Robert's first assignment of error is sustained. Before a trial court can terminate parental rights, the Agency must first prove that it has made a case plan to try and correct the problems and return the children to their parents. Since the Agency failed to do so in this case, Robert's second assignment of error claiming that the judgment was against the manifest weight of the evidence, is also sustained.

{¶34} The judgment of the Court of Common Pleas of Hancock County, Juvenile Division, is affirmed in part and reversed in part.

*Judgment Affirmed in Part and*
*Reversed in Part*

**ROGERS, J., concurs.**

**/jlr**

**SHAW, J., concurs in part and dissents in part:**

{¶35} I concur with the majority opinion overruling Amber's five assignments of error and affirming the trial court's judgment as to Amber. Because I believe the decision of the trial court with regard to Robert was supported by clear and convincing evidence, which was within the prerogative of the trial judge and not the appellate court to weigh, I respectfully dissent from the majority decision to sustain Robert's assignments of error and reverse the trial court's judgment as to Robert.

{¶36} The majority decision as to Robert is based primarily upon 1) criticism by the majority of agency conduct with regard to Robert, 2) an apparent personal preference by the majority for the testimony of Dr. Patrick over the testimony of Dr. Connell with regard to Robert's fitness to parent and 3) an independent weighing by the majority of the significance of Robert's criminal history and drug abuse issues, together with a unique review of the GAL report - all of which leads the majority of the appellate court to conclusions which are simply different from the conclusions of the agency, different from the conclusions of Dr. Connell, different from the conclusions of the GAL, and different from the conclusions reached by the trial judge upon his evaluation of all the evidence as trier of fact.

{¶37} The testimony and recommendations of the agency, the GAL and Dr. Connell all clearly supported the trial court's judgment. However, the trial judge did not base his decision merely upon those recommendations. On the contrary, the trial judge considered all of the testimony, including that of Robert's wife--which I would note, was particularly insightful both as to Robert's fitness to parent and as to the home environment which would be offered to the child if Robert gained custody. Based upon *all of the evidence*, the trial judge then made a number of relevant and thoughtful findings with regard to Robert in paragraphs 5 and 6 of the final judgment entry. The following are particularly instructive:

> **"In particular this court is concerned regarding the relationship between the child's natural parents. The father is Robert Essex, age 62. The mother is Amber Watson, age 21, who has a third child in the custody of the child's biological father. The two children who are the subject of this case were conceived and born while Mr. Essex was living with his wife of 17 years. From the report of Dr. David Connell (CPSU Exhibit 3) Mr. Essex's marital history, educational background, number of previously born children, family background, are unclear and have been the subject of contradictory reports offered by him. Mr. Essex has been prescribed Percocet for back pain but when tested in April 2008 he tested positive for barbiturates and Dilaudid but negative for Percocet. Mr. Essex had no prescription for Dilaudid, which is a much more powerful drug than Percocet. Mr. Essex's current drug usage is unclear as is his entire life history. It is known that Mr. Essex served several years in prison in 1987 after pleading guilty to four counts of Intent to Deliver Heroin."**

> \* \* \*

> **"While the child has been in custody, the parents have had three case workers in addition to a parent educator. Despite Mr. Essex having several successful unsupervised visitations with the child, none of them have recommended a return of the child to his home nor have they offered an opinion that the child can be returned home anytime within the foreseeable future."**

> **\* \* \***

> **"\* \* \* The father appears to be an inappropriate parent for the reasons expressed by Dr. David Connell. Dr. Connell stated that while Mr. Essex is an intelligent person, his personality traits are indicative of manipulativeness, deceitfulness, lack of self-awareness, callous disregard for the feelings of others, and serious criminal behavior in his past."**

> **\* \* \***

> **"*The court is further aware that it has before it two psychological evaluations that arrive at contradictory conclusions. It is this court's responsibility to weigh the evaluations and decide which one is the most credible. This court has read both evaluations and viewed the testimony of the respective doctors and has concluded that the testimony of Dr. Connell is more thorough and persuasive*." (Emphasis added.)**

{¶38} In my opinion, the trial court carefully set forth the evidence and then accurately identified and performed its responsibility to evaluate the credibility and persuasiveness of that evidence, exactly as it is supposed to do under the law. Unfortunately, in my view, the majority has simply re-evaluated the credibility and persuasiveness of this same evidence--as represented in a written transcript only--and has substituted the personal assessment of the appellate court

for that of the trier of fact--which is exactly what we are not supposed to do as a reviewing court under the law.

{¶39} For all of these reasons, I would overrule Robert's assignments of error and affirm the judgment of the trial court in its entirety.

**/jlr**