[Cite as *In re S.B.*, 2014-Ohio-1481.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:

      S.B.,                                CASE NO.  5-13-27

ALLEGED NEGLECTED AND
DEPENDENT CHILD.              O P I N I O N

[ANNA MUZY - APPELLANT].

IN RE:

      H.B.,                                CASE NO.  5-13-28

ALLEGED NEGLECTED AND
DEPENDENT CHILD.              O P I N I O N

[ANNA MUZY - APPELLANT].

IN RE:

      P.B.,                                CASE NO.  5-13-29

ALLEGED NEGLECTED AND
DEPENDENT CHILD.               O P I N I O N

[ANNA MUZY - APPELLANT].

Case Nos. 5-13-27, 5-13-28, 5-13-29

---

**Appeals from Hancock County Common Pleas Court
Juvenile Division
Trial Court Nos. 21130047, 21130048 and 21130049**

**Judgments Affirmed**

**Date of Decision:   April 7, 2014**

---

**APPEARANCES:**

   *Charles R. Hall, Jr.* **for Appellant**

   *Rebecca S. Newman*  **for Appellee**

**WILLAMOWSKI, P.J.**

   **{¶1}** Appellant Anna Muzy ("Anna") brings this appeal from the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, terminating her parental rights and granting permanent custody of the minor children to Appellee Hancock County Job and Family Services – Children's Protective Services Unit ("the Agency").  For the reasons set forth below, the judgment is affirmed.

   **{¶2}** On November 9, 2011, S.B., born in 2005, H.B., born in 2007, and P.B., born in 2008, (collectively known as "the children") were removed from

-2-

Anna's home via ex parte order for emergency temporary custody. Doc. 1. A hearing on the complaints and motions filed by the Agency was held on November 14, 2011. Doc. 7. The trial court determined that there was probable cause for the filing of the ex parte orders and placed the children in the temporary custody of the Agency. *Id.* On December 8, 2011, the Agency filed a case plan. Doc. 12. The case plan required Anna to complete the following tasks: 1) obtain a mental health and substance abuse screening and follow the recommendations; 2) obtain an assessment from the Family Resource Center and follow through with recommended services; and 3) clean and maintain the home.[1] On December 16, 2011, the trial court appointed Helen Ruhlen ("Ruhlen") as the guardian ad litem for the children. Doc. 13. The adjudication hearing on the complaint was held on December 29, 2011. Doc. 14. With the consent of all parties, the trial court found that the children were neglected and dependent. *Id.* The dispositional hearing was held on January 17, 2012. Doc. 19. The parties agreed that the children would be placed in the temporary custody of the Agency. *Id.* The trial court also adopted and approved the case plan requiring the above mentioned services. *Id.*

{¶3} On March 20, 2012, Anna filed a motion requesting unsupervised parenting time with the children. Doc. 21. The trial court set the hearing on the motion for May 3, 2012. Doc. 22. On the day of the hearing, the matter was

---

[1] Additional requirements were in the plan, but they did not apply to Anna, who is the sole appellant in this case and are thus irrelevant.

continued until June 26, 2012, because Ruhlen was not present. Doc. 25. On May 8, 2012, the Agency filed the semiannual review of the case plan. Doc. 27. The review indicated that Anna had completed the mental health and substance abuse assessment and that all the drug screens were negative. *Id*. at 2. Anna was receiving counseling for depression due to the removal of the children, but was described as cooperative by the mental health service provider. *Id*. Anna had also completed the parenting class, but was referred for an additional program to help her understand the importance of routine, consistency, and supervision in the home. *Id.* at 3. Finally, the review indicated that Anna had moved into a safer home which was clean. *Id*. at 5. The review indicated that Anna needed to show that she could maintain the home for the children. *Id.* The summary of the progress was as follows.

> **The [A]gency would recommend that [the children] remain in the foster home at this time to allow the parents to participate in intensive, hands on parent education and to determine if [Anna] can maintain safe and stable housing for the children. Once hands on parenting has begun and a good progress report is received, unsupervised time can be considered. [Anna] will need to show that [she] can cooperate with the [Agency] and service providers and that [she] can make changes in [her] parenting style so that the boys have adult supervision at all times for their safety and well being.**

*Id*. at 8. On June 26, 2012, Anna withdrew her motion to modify the disposition. Doc. 28. On August 21, 2012, the Agency filed a notice that visitation was being changed to allow Anna three hours of unsupervised visitation once a week. Doc.

29. The reason for the unsupervised visitation was the full compliance of Anna with the treatment recommendations resulting from the parenting assessment and mental health assessment, and from Anna's maintaining stable and safe housing. *Id.*

{¶4} On October 4, 2012, the Agency filed a motion for a six month extension of temporary custody of the children. Doc. 30. The Agency then filed on October 23, 2012, the semiannual review of the case plan. Doc. 33. The review indicated that Anna had made significant progress in the area of the mental health assessment and the review recommended terminating services in that area as the goals were met. *Id.* at 3. As to parenting skills, the review indicated that progress was being made and that Anna was working cooperatively with the family aide. *Id.* at 4. Finally, the review indicated that Anna had moved to a suitable home and was keeping it clean and safe. *Id.* at 6. The review indicated that Anna had made significant progress towards this goal, but recommended keeping it as part of the recommended services. *Id.* The recommendation of the Agency was as follows.

> **The [A]gency would recommend that the children remain in the foster home until a gradual transition can be made back into the home. The children are participating in unsupervised time two days per week and will increase to overnights if they received [sic] good reports from home based therapist and there are no new reports of child abuse or neglect.**

*Id.* at 18. On November 2, 2012, the trial court granted the motion for an extension of temporary custody and ordered that the current case plan remain in effect. Doc. 34. On November 9, 2012, the Agency filed a notice that overnight visits between the children and Anna would now be allowed based upon the positive reports received from service providers. Doc. 35.

**{¶5}** On April 8, 2013, the Agency filed a motion for permanent custody. Doc. 47. The Agency also filed a semiannual review of the case plan. Doc. 49. This review indicated that the Agency had referred Anna for more counseling, but she did not comply.[2] *Id.* at 2. The review indicated that due to a claim of sexual abuse against her husband, Justin Muzy ("Muzy"), the Agency was concerned about Anna's parenting skills in that she was considered uncooperative during the investigation and the Agency questioned her willingness to protect the children. *Id.* at 3. Finally, the review indicated that Anna and Muzy had lost their housing due to Muzy losing his job and they were living with extended family. *Id.* at 5. The Agency had referred them to the housing office and Metro Housing. *Id.* The review summarized the progress as follows.

> **The [A]gency would recommend continued out of home placement at this time due to the new substantiated report of sexual abuse. At the time of this review, [Anna] has not talked to or completed any interviews with the investigator. [Muzy] cooperated with the investigation after securing a new attorney,**

---

[2] No new case plan had been filed between this review and the October 23, 2012, case plan which terminated mental health services as being completed. This raises a question as to whether the Agency had officially made the return to counseling part of the case plan or whether it was merely a suggestion.

> **however, [Muzy] failed the polygraph that was administered to him. [Muzy and Anna] have reported that they no longer have safe and stable housing at this time. The potential risk to the children at this time is high and [Anna] has made no modifications to reduce safety [sic] for her children. The children have been in care for over one year and need permanency and therefore the [A]gency has requested permanent custody of all three boys.**

*Id.* at 8. On July 24, 2013, the Agency filed a comprehensive assessment planning model for the case plan indicating that the permanency goal for the children was adoption. Doc. 70.

{¶6} On August 5, 2013, the trial court allowed Ruhlen to withdraw as the guardian ad litem for the children. Doc. 73. The trial court then appointed Kimberly Freytag-Shope as the guardian ad litem ("GAL"). *Id.* The GAL filed her report and recommendations on August 13, 2013.[3] Doc. 75. The GAL indicated in her report that she had contacted various employees of the Agency, the foster parents, and the attorney for Muzy. *Id.* at 4. She did not have any contact with the children or with Anna.[4] *Id.* The GAL recommended that

---

[3] Pursuant to Hancock County Local Rule 39(E), the GAL's report is to be submitted to the trial court, which will notify the parties that it is available for review at the court. The court will then make the report an exhibit in a contested proceeding. By implication, it appears that the GAL report should not be filed with the clerk of courts, but should rather be submitted directly to the court in order to protect the privacy of the children.

[4] This court notes that the validity of the opinions in the report are suspect as the GAL only had eight days between being appointed and filing the report. Additionally, the GAL did not meet the minimal requirements of meeting with the children, interviewing them, or observing them and did not meet with the parents. See Sup.R. 48(D)(13). Other than speaking with Agency personnel and the foster parents, the GAL merely read the record provided by the Agency. While this is understandable due to the short time frame, it does not lend itself to allowing the GAL to maintain independence and objectivity as required by Sup.R. 48(D)(2).

permanent custody of the children be granted to the Agency so that the children could be adopted. *Id*. at 8.

{¶7} The hearing on the motion for permanent custody was held on August 20 and 21, 2013. Doc. 81. The Agency presented the testimony of seven witnesses. The first witness was Jamie Fall ("Fall"). Tr. 20. Fall is a licensed professional counselor. Tr. 20. Fall began seeing S.B. and H.B. in August of 2012. Tr. 23. He saw S.B. and H.B. approximately once a week, but P.B. sometimes participated. Tr. 23-24. In November of 2012, the foster mother reported to Fall that she had been told by a respite provider that the children were acting out in a sexual manner and had alleged that they had been abused by Muzy. Tr. 25-29. Fall then questioned S.B. about it and confirmed the report of abuse. Tr. 30-31. H.B. and P.B. confirmed what S.B. had reported. Tr. 45-46. Fall then reported the abuse as required by law. Tr. 33.

{¶8} The second witness was Karmen Lauth ("Lauth"), who was the caseworker for the Agency who handled this case. Tr. 50-51. Lauth testified that the children had been in the temporary custody of the Agency since November 9, 2011. Tr. 57, 59. She testified that the Agency filed for permanent custody in April of 2013. Tr. 57. Thus the children had been in the temporary custody of the Agency for at least twelve out of twenty-two consecutive months. Tr. 58. The children were removed from the home when the police notified the Agency that

they would be pressing child endangerment charges due to multiple, substantiated reports of the children being outside, unsupervised, and dressed inappropriately for the weather. Tr. 62. The children were adjudicated dependent on December 30, 2011. Tr. 71. As the disposition, the trial court ordered on January 18, 2012, that the Agency maintain temporary custody of the children. Tr. 72. The Agency filed for permanent custody after a new report of abuse was made and the subsequent investigation. Tr. 78. After November of 2012, Lauth testified that she observed that during the visits, Anna became overwhelmed when the children started acting out. Tr. 109. Lauth described the visits as having "a very negative overtone" and stated there was no smiling, laughing or playing. Tr. 109.

{¶9} Lauth testified that H.B. and P.B. were receiving speech therapy for their delays and that they were progressing well. Tr. 141-42. Although the children had been referred to Help Me Grow prior to their removal, this had not occurred at that time. Tr. 142. The children were medically on target after some initial issues were resolved. Tr. 144-45. Throughout the pendency of this case, the visits between the children and Anna have had a tendency to become chaotic. Tr. 146. The visits proceeded to one overnight visit before S.B. disclosed potential sexual abuse at the hands of Muzy. Tr. 150. As a result, unsupervised visits were immediately suspended. Tr. 151. Lauth testified that Anna regularly visited with the children and there were no issues with nonattendance. Tr. 152.

However, Lauth testified that Anna would not be able to provide an adequate permanent home for her children. Tr. 165.

> **Basically because of the lack of [Anna's] inability [sic] to protect. She did not acknowledge the investigation of sexual abuse. She does not believe that it happened. And her lack of progress on the case plan with regard to parenting and the housing issue.**

Tr. 165. Lauth testified that the children were attached to Anna and loved her, but there were power struggles during the visits. Tr. 167. The bond and love between Anna and the children was insufficient, in her opinion, to overcome the concerns raised by Anna's parenting. Tr. 169. The relationship between the children and the foster parents was better in that the children were calmer, followed the rules, and played cooperatively while in the foster home. Tr. 169. Lauth testified that in her opinion, the children would "grow and thrive in a permanent home which can be provided to them through adoption. They can have a safe – safety, stability, protection from harm." Tr. 173. She also testified that the children had a "very good chance" of being adopted. Tr. 174.

{¶10} On cross-examination Lauth testified that the allegation of abuse was substantiated. Tr. 176. However, she admitted that the children had been acting out sexually prior to the alleged abuse and during the time all visits were supervised. Tr. 177. Lauth also testified that there were no criminal charges pending against Muzy as a result of the alleged abuse. Tr. 177. She also admitted that no other agency or organization has substantiated the claims against Muzy.

-10-

Tr. 179. Lauth admitted that she had not put the requirement of additional counseling into the case plan when subsequent issues came up and that she did not know if Anna was aware of the referral to Century Health. Tr. 181. Lauth testified that as long as Anna is married to Muzy, there was a safety issue which would prevent reunification due to the allegations against Muzy. Tr. 182.

{¶11} The third witness for the Agency was Alison Kuhn ("Kuhn"), who was a case worker for Keeping Kids Safe. Tr. 198-99. Kuhn testified that she was the case worker who placed the children with their foster parents, Gary and Julie Hiser. Tr. 201. The job of her agency was to work with the children while the Agency works with the parents. Tr. 204. Kuhn testified that she received the report from the respite workers concerning the sexual acting out of the children. Tr. 208-209.

{¶12} Ginger Wilson ("Wilson") testified next. She testified that she provided respite care for the children. Tr. 216. She testified that she observed the children acting out inappropriately and making what she described as "sexual gesturing". Tr. 217. She then reported the behavior to Kuhn. Tr. 224.

{¶13} The fifth witness for the Agency was Jeri Steinbrook ("Steinbrook"), who investigated the allegations of sexual abuse. Tr. 236. Steinbrook testified that she spoke with the foster parents, the children, Fall, Kuhn, and Muzy, but not with Anna. Tr. 236-38. Steinbrook asked Kuhn to get the witness statements and

she then reviewed them without speaking to the actual witness. Tr. 239. Steinbrook testified that she interviewed the children and a detective observed the interview from behind glass. Tr. 246. During the interviews, S.B. made statements indicating he was abused. Tr. 250. Both H.B. and P.B. did not make any allegations of abuse during their interviews. Tr. 251. Based upon S.B.'s statements and the behavior of the children, Steinbrook found that the claim of sexual abuse was substantiated as to all three children. Tr. 254. Procedure then is to send a letter to the parents indicating the outcome of the investigation and close the investigation. Tr. 256-57.

{¶14} The next witness presented by the Agency was Tabitha Whaley ("Whaley"), who is the Harmony House case manager. Tr. 276. Whaley testified that Anna began visiting with the children at Harmony House in November of 2011. Tr. 285. Anna had been scheduled for almost one hundred visits over time. Tr. 285. Anna's visits with the children twice a week, two hours at a time for a total of four hours per week. Tr. 291. Since December of 2012, the children have been acting out more and pushing Anna's limits and this has resulted in inconsistent discipline. Tr. 291. Whaley testified that at times, the children will start arguing and they ignore Anna when she tells them to stop. Tr. 293. Whaley testified that the children act out more than the average child their ages. Tr. 294.

Anna has made most of her visits and her visits have never been suspended. Tr. 294.

{¶15} The final witness for the Agency was the foster mother, Julie Hiser ("Hiser"). Tr. 312. Hiser testified that the children were placed in her home in November of 2011. Tr. 312. Hiser testified that in her care, the boys are doing well. Tr. 334. On cross-examination, Hiser testified that at that time, they had no plans to adopt the children. Tr. 335. In Hiser's opinion, the children are bonded with each other, though the children struggle with interacting together. Tr. 338. She testified that it would be in the children's best interest to stay together. Tr. 338.

{¶16} After the Agency rested its case, Anna rested without calling any witnesses or presenting any evidence. The final witness in the case was the GAL. The GAL testified that in her opinion, the children would be best served by permanent custody being granted to the Agency. Tr. 347. On cross-examination, the GAL testified that P.B. was too young to state a preference, but that S.B. and H.B. had stated that they wished to be returned to Anna.[5] Tr. 348. At the conclusion of the hearing, the trial court took the matter under advisement. Tr. 365. On August 23, 2013, the trial court entered judgment granting the Agency's motion for permanent custody. Doc. 81. Anna filed her notice of appeal from this

---

[5] Since the opinion of the children and that of the GAL could be considered in conflict, the children had their own counsel at the hearing.

judgment on September 26, 2013. Doc. 89. On Appeal, Anna raises the following assignments of error.

### First Assignment of Error

**The trial court's decision to terminate [Anna's] parental rights and grant permanent custody to the [Agency] is against the manifest weight of the evidence.**

### Second Assignment of Error

**The trial court erred in granting permanent custody for the children because it was not in their best interest.**

### Third Assignment of Error

**The [Agency] failed its duty to use reasonable case planning and diligent efforts at reunification with the parent.**

### Fourth Assignment of Error

**[The Agency] did not make a good faith effort to reunify [Anna] with her children.**

### Fifth Assignment of Error

**The trial court erred in granting permanent custody of the children to the [Agency] because clear and convincing evidence was not presented to establish that the children could not be returned to [Anna] within a reasonable time.**

{¶17} The first, second, and fifth assignments of error all challenge the granting of the motion for permanent custody on the grounds that the judgment was not supported by the evidence and thus, they will be discussed together. The right to raise one's own child is a basic and essential civil right. *In re Murray*

(1990), 52 Ohio St.3d 155, 556 N.E.2d 1169. "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. Hancock No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

> **(B)(1)  Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **\* \* \***
>
> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**
>
> **For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from home.**
>
> **\* \* \***

**(C)  In making the determination required by this section * * *, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section * * * but shall not be submitted under oath.**

**\* \* \***

**(D)(1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:**

**(a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;**

**(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414.  Pursuant to this statute, an Agency is not required to prove that

the child could not or should not be returned to the parents within a reasonable

time if the child has been in the temporary custody of the Agency for twelve out of a consecutive twenty-two month period of time. R.C. 2151.414(B)(1)(d), *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶21. If this situation is proven, the Agency need only prove that it is in the best interests of the child, as set forth in R.C. 2151.414(D), to grant the motion of the Agency for permanent custody. *In re M.R.*, 3d Dist. Defiance No. 4-12-18, 2013-Ohio-1302, ¶ 26.

{¶18} A review of the record in this case indicates that the children were removed from the home on November 9, 2011. The children were adjudicated as dependent and neglected on December 29, 2011. The motion for permanent custody was filed on April 8, 2013. This time frame is a little more than fifteen months after the children were adjudicated dependent. Thus, the Agency has shown by clear and convincing evidence that the children were in the temporary custody of the Agency for at least twelve out of twenty-two consecutive months. Thus, the trial court then was required to consider whether the granting of the motion was in the best interest of the children, not whether the children could or should be returned to the parents within a reasonable time. For this reason, the fifth assignment of error is overruled.

{¶19} Having determined that the child had been in the custody of the Agency for twelve out of a consecutive twenty-two month period, the trial court

only needed to address whether granting the Agency's motion for permanent custody was in the best interest of the children. The trial court specifically stated that it had considered the statutory factors set forth in R.C. 2151.414(D). Doc. 81, 4. A review of the record indicates that the Agency presented testimony showing that the three children were bonded with each other and should remain in the same home. The Agency also presented evidence that the children were doing well in the foster home and, had a good relationship with the people living in the home. Although there was testimony that indicated that Anna loved her children, and the trial court also found that this was so, there was also testimony that she was frequently overwhelmed when attempting to parent the children. The Agency also presented evidence that although the boys had stated they wished to go back to Anna, at other times, they were unsure as they also loved their foster parents. Tr. 348. The GAL indicated that in her opinion, it would be in the children's best interests if the motion for permanent custody were granted. The children were rather young at the time of the hearing as the ages of the boys ranged from five to eight years of age. The trial court also noted that the children had been living out of the home for over a year at the time the motion was filed. In making its ruling, the trial court held as follows.

> **There is little doubt that the parents love their children evidenced by the fact that [Anna] has visited over 100 times and father has recently started case plan services but despite considerable efforts by the agency and other care providers the**

> **situation with the parents is basically unchanged from the date of original removal. * * * [Anna] is living with and is married to a man who is alleged to have sexually abused one of the children. The allegation was labeled by CPSU as "substantiated." The children have exhibited behavior that is indicative of being a victim of sexual abuse. [Anna] does not believe the allegations against her husband and has no plans to live separately from him. * * * The children will never be able to be returned to their mother as long as she is living with her present husband. The children cannot just be placed in storage until the relationship between the mother and her husband dissolves. There is little hope that the situation will improve with the passage of time.**

*Id.* at 4-5. Based upon the testimony before it, the trial court did not abuse its discretion in determining that granting the Agency's motion for permanent custody was in the best interests of the children. There was competent and credible evidence presented, which if believed, would show by clear and convincing evidence that parental rights should be terminated. Therefore, the first and second assignments of error are overruled.

{¶20} In the third and fourth assignments of error, Anna argues that the Agency did not make a good faith effort to reunify the children with her and failed to make a case plan which could sufficiently do so.

> **Case plans are tools that the Agency uses to set forth the goals of the parents to allow for the return of the children to their parents. *Leveck*, *supra* at ¶10. These plans must take into consideration the individual circumstances of each case, including the abilities of the parents and the children. *Id.* "Nevertheless, the issue is not whether there was anything more that [the Agency] could have done, but whether the [Agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *Id.***

-19-

*In re. C.E.*, 3d Dist. Hancock Nos. 5-09-02, 5-09-03, 2009-Ohio-6027, ¶15. In *C.E.*, this court held that the Agency had not made a case plan in good faith when the father had completed all of the case plan objectives, only to be told that he needed to do more, although the additional requests were not made a part of the case plan, but were merely suggestions. The father in *C.E.* had progressed to the point of having unsupervised weekend visits at the time the hearing for permanent custody was held showing that significant progress had been made. Additionally, the Agency in that case moved for permanent custody on the grounds that the father had not complied with the case plan and admitted that he had successfully complied with all of the requirements of the case plan. This is different than the case before us now.

{¶21} Here, Anna did complete the parenting classes and counseling, however, she had not managed to find adequate and appropriate housing. The home that Anna and Mr. Muzy were living in on the date of the hearing was a one bedroom apartment.[6] Tr. 134. In addition, there were questions about how Anna was applying what she learned from the parenting classes. The Agency did request that Anna receive additional counseling after the allegations of sexual abuse of the children were made. Unlike in *C.E.*, the request was not merely a suggestion. Lauth testified that she formally referred Anna to the counseling

---

[6] The adequacy of the apartment for the children was not discussed as Lauth had not been able to see the apartment at the time of the hearing due to the fact that Anna had recently moved to that location.

agency and sent a copy of the referral letter to Anna. At that time, the case plan ordered by the judge still required Anna to complete counseling as the amended case plan recommending terminating the service was not adopted by the trial court. Doc. 34. This testimony was not disputed by Anna. Although it would have been better for the Agency to make the return to counseling a formal part of the case plan, the evidence does not show, as argued by Anna, that the Agency merely "waited the statutory time period to file the permanent custody motions". Appellant's Brief, 15. The children were adjudicated dependent and neglected on December 29, 2011. Thus, the Agency could have filed for permanent custody pursuant to 2151.414(B)(1)(d) on December 29, 2012. The Agency did not file for permanent custody until April 8, 2013. Between the time the allegations were made and the day the Agency filed a motion for permanent custody of the children, the Agency continued to work with Anna to attempt to remedy the situation which caused the removal of the children and to address the new concerns. However, instead of continuing to make progress, the testimony of Whaley was that Anna and the children were making no progress and were actually regressing in the progress previously made. Tr. 299. Additionally, Lauth testified that even after Anna was informed about the allegations of sexual abuse raised by the children, Anna told her that she had no intention of living separately from her husband. Tr. 170. Given the facts of this case, this Court cannot say that

the Agency did not make a good faith effort to reunite the children with Anna or that the case plan was insufficient to do so. Thus, the third and fourth assignments of error are overruled.

{¶22} Having found no error prejudicial to the Appellant in the particulars assigned and argued, the judgments of the Court of Common Pleas, Juvenile Division, are affirmed.

***Judgments Affirmed***

**ROGERS and PRESTON, J.J., concur.**

**/jlr**