[Cite as *In re K.H.*, 2010-Ohio-3801.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN THE MATTER OF:

    K. H.,                                  **CASE NO.  5-10-06**

ALLEGED NEGLECTED AND
DEPENDENT CHILD,

                                      **O P I N I O N**

[AMBER HIGGINBOTHAM -
    APPELLANT].

Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20930009

**Judgment Affirmed**

Date of Decision:   August 16, 2010

**APPEARANCES:**

    *Nicole M. Winget*  for Appellant

    *Mark C. Miller and Benjamin E. Hall*  for Appellee

**ROGERS, J.**

{¶1} Mother-Appellant, Amber Higginbotham, appeals the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, granting permanent custody of her child, K.H., to the Hancock County Job and Family Services, Children Protective Services Unit (hereinafter "CPSU"). On appeal, Mother contends that the trial court's judgment granting CPSU permanent custody was against the manifest weight of the evidence; that the trial court erred by not making a finding on the record as to K.H.'s wishes and not appointing him separate counsel; that the trial court erred in granting CPSU permanent custody because it was not in K.H.'s best interest; that the trial court's finding that Mother abandoned K.H. was not supported by clear and convincing evidence; and, that CPSU failed to use reasonable case planning and diligent efforts to achieve reunification. Based upon the following, we affirm the judgment of the trial court.

{¶2} In February 2009, CPSU filed a complaint alleging that K.H. was a neglected child pursuant to R.C. 2151.03. Additionally, CPSU requested ex-parte temporary custody of K.H. Service of the complaint to Mother and the purported biological father was facilitated by publication.[1] Shortly thereafter, the trial court granted CPSU emergency temporary custody and appointed a Court Appointed Special Advocate/Guardian ad Litem (hereinafter "GAL") to represent K.H.

---

[1] At that point in time, Mother had identified a possible father of K.H. who was later eliminated as the father after administration of a paternity test.

{¶3} In March 2009, the GAL filed a report stating that CPSU became involved in the case when K.H.'s caretaker, his maternal grandmother, turned the child over to the police department because she was unable to care for him due to her own health issues and K.H.'s extensive health issues. At that time, Mother was living in Chicago, Illinois, and K.H.'s biological father was unknown.

{¶4} In April 2009, CPSU submitted a case plan, which the trial court approved. The case plan recommended that Mother participate in home-based therapy to develop her parenting skills and knowledge; that Mother report to Century Health and participate in a life skills group; that Mother provide a safe and stable home for K.H.; that Mother undergo a mental health and substance abuse assessment; and, that K.H. receive counseling services.

{¶5} In August 2009, the trial court conducted a semiannual case plan review. The CPSU case progress review provided that Mother had made insufficient progress towards developing additional life skills because she had not participated in the group at Century Health as required; that Mother had made insufficient progress towards receiving mental health and substance abuse assessments because she had not participated in these assessments as required; that K.H. had made significant progress toward receiving counseling services, as he had been working with a therapist and taking medication; that Mother had made insufficient progress towards acquiring parenting knowledge and skills as she had

not participated in any home-based therapy or other parenting programs; and, that Mother had made insufficient progress toward providing a safe and stable living environment for K.H. The CPSU report concluded that Mother had not made significant progress toward addressing the case plan concerns.

{¶6} In November 2009, CPSU filed a motion for permanent custody of K.H. pursuant to R.C. 2151.353, 2151.413, and 2151.414 on the bases that it was in K.H.'s best interest; that K.H. was abandoned; and, that, alternatively, K.H. could not or should not be placed with either parent within a reasonable time. K.H.'s unknown father[2] was served via publication

{¶7} In January 2010, the trial court held a hearing on the motion for permanent custody, at which the following testimony was heard.

{¶8} Robin Brown, a mental health therapist at Century Health, testified that she had never met with Mother; that Century Health received a notice in February 2009 that Mother was ordered to attend services at that agency; that, since that time, neither she nor anyone else at Century Health had been contacted by Mother to begin services; that Century Health had not conducted a mental health or substance abuse assessment on Mother; that Mother also never contacted Century Health to begin the Life Skills program; and, that Mother also never began the substance abuse program at Century Health. On cross-examination,

Brown testified that, if Mother contacted the agency, she could still take part in these programs, and that she did not know if there were any agencies comparable to Century Health in Dayton, Ohio.

{¶9} Mark Olthouse, a caseworker at CPSU, testified that he had been K.H.'s caseworker since February 2009, when he came into the agency's custody; that the agency attempted to identify K.H.'s father by administering paternity tests to several men alleged by Mother to be the father, which excluded those men as the father, and by contacting the putative father registry; that, despite notification via publication, no one presented himself as K.H.'s father; that Mother never identified any other potential fathers to him; that Mother had not visited K.H. since June 12, 2009, or made any phone calls or sent gifts; that, on the date K.H. was removed from his grandmother's home, Mother could not be located; that Mother later appeared at a court hearing; that the agency was concerned with placing K.H. back in Mother's custody because she had little involvement with him according to several relatives, because she had no permanent residence and had been living in Illinois and New York, and because she told him directly that she could not care for him; that he conducted a home visit with Mother at the grandmother's home in March 2009, at which Mother indicated she could not

---

[2] Mother identified several men who had possibly fathered K.H.; however, all of the men were eliminated as K.H.'s father after administration of paternity tests. The record does not demonstrate that K.H.'s father was ever identified.

provide food and housing for K.H.; that he informed Mother about a transitional facility called "Hope House" through which she could obtain housing and job training; that Mother did not follow through with the facility; that he requested that Mother inform him of any changes of address, which she did not do, and he was uncertain of where she was living from April through July 2009; that, in August 2009, he learned through the grandmother that Mother was living in Dayton, Ohio; that he left, at a minimum, monthly voice messages at the phone number provided to him by the grandmother; that Mother did not return his phone calls; that Mother did not complete any of the case plan objectives; that, between Mother's first visit with K.H. on April 3, 2009, and her last visit on June 12, 2009, she only visited two other times; that he had never been contacted by an agency in Dayton indicating that Mother was receiving any type of social services through that agency; that he did not believe a six-month extension of temporary custody would change Mother's compliance with the case plan; that K.H.'s relationship with Mother was casual at best; that K.H. had never inquired as to Mother's whereabouts; that K.H. was bonded with his foster parents; that he believed CPSU's permanent custody was in K.H.'s best interest; that K.H. needed a permanent adoptive home and had not had permanency in the past; that the agency had personally referred Mother for services for mental health, substance abuse, life

skills, home-based therapy, parenting skills, and visitation; and, that K.H. had a high probability of being adopted.

{¶10} On cross examination, Olthouse testified that K.H.'s current foster parents had expressed that they would not adopt him because they had a newborn child in the home; that he did not give Mother any literature about the Hope House; that he did not tell her where to send any potential correspondence to K.H.; and, that Mother left him a voice message on April 15, 2009, informing him that she had an appointment scheduled with Robin Brown at Century Health, but had to cancel it because she had no transportation.

{¶11} Mother testified that she had not visited K.H. since June 2009; that, two weeks prior to the hearing, she went to the visitation center, but she had not called prior to arriving so K.H. was not there or available for visitation; that she had not visited with K.H. for months when she lived in Findlay because it was "a long walk" and she had no other transportation; that Olthouse gave her ten bus tickets, but she ran out and was unable to get more; that she moved to the Dayton area in August 2009 and was not able to visit K.H. because the visitations were scheduled on Fridays when her boyfriend was working and was unable to drive her; that she did not follow through with the mental health/substance abuse counseling objective because of transportation issues; that she had attempted to create a safe and stable living environment for K.H. by moving into her

boyfriend's apartment in Dayton; that she was looking for employment and had applied for social security; and, that she "would love to take parenting classes." (Hearing Tr., p. 78).

{¶12} Mother testified on cross-examination that she gave birth to K.H. when she was incarcerated for drug trafficking; that, even after being released from prison, she was unable to care for K.H.; that her mother, K.H.'s grandmother, cared for him; that she had never cared for K.H. for an extended period of time; that, when she was living in Findlay, she did not ask Olthouse for more bus tickets or tell him that she could not afford bus tickets to transport her to visitations with K.H.; that she did not think it was CPSU's fault that she did not inform them about her transportation issues; that she had moved multiple times between different relatives and visiting a friend in Chicago; that she and her boyfriend began dating in August 2009, which is when she moved in with him; that she did not think it would be harder to see K.H. once she moved to Dayton because her boyfriend had transportation; that she did not ask Olthouse to schedule the visitations on a date and time when her boyfriend could drive her; that, she understood that K.H. was not kept at the visitation center and that she needed to call to let the foster parents know to take him for the visitation, but that she did not call when she attempted to visit two weeks prior to the hearing; that she had been "calling around" to see if there was an agency offering parenting classes in Dayton for about three or four

months, but had not attended any parenting classes; that she had not called CPSU to see if they could assist her with financing parenting classes; that she had been addicted to cocaine and marijuana in the past, but was not currently addicted to a substance; that she had not contacted CPSU to ask them to evaluate her boyfriend's apartment in Dayton to see if it was appropriate for K.H.; and, that she had not even contacted CPSU to inform them of her Dayton address prior to learning of the permanent custody motion.

{¶13} James Kelly testified that he had served as K.H.'s GAL from March 2009 until the point of the hearing; that he prepared a report for the trial court; that he recommended the trial court award permanent custody of K.H. to CPSU; and, that he did not believe CPSU could have done more to achieve reunification of Mother with K.H.

{¶14} Additionally, the GAL submitted a report and recommendations to the trial court, including, in part, a section entitled "Wishes of the Child," stating that, "[t]his child is only four years of age. He has bonded with his foster care parents and the foster care extended family. [K.H.] rarely spoke and never expressed himself during any of my visits with him. I believe the wishes of this child would be to remain with these foster care parents or to be placed into adoption with loving and caring adoptive parents or adoptive parent." (Report and Recommendations of CASA/GAL, p. 5). Further, the report provided that K.H.

was "slightly behind in his developmental growth," was being treated for mental health issues, and was taking part in classes for speech, therapy,[3] social skills, and counseling. (Id).

{¶15} Thereafter, the trial court found pursuant to R.C. 2151.414(C), and by clear and convincing evidence, that 1) K.H. could not be placed with Mother within a reasonable time under R.C. 2151.414(B)(1)(a) because she had continuously and repeatedly failed to substantially remedy the conditions that caused K.H. to be removed from the home and failed to utilize the services available to her; 2) it was in K.H.'s best interest that CPSU have custody pursuant to all of the relevant factors in R.C. 2151.414(D)(1) through (5) and 2151.414(E)(7) to (11), particularly the lack of relationship of K.H. with his parents and relatives, his need for legally secure permanent placement, the unlikelihood of this type of placement without granting of permanent custody to CPSU, and the custodial history of K.H., as well as his desires as expressed through his GAL; and 3) K.H. was abandoned by his parents, as his father was unknown and his mother had failed to visit him for the seven-month period preceding the hearing. Accordingly, the trial court granted CPSU permanent custody of K.H. pursuant to R.C. 2151.414(A).

---

[3] The Report and Recommendations of the CASA/GAL refer to classes in "speech, therapy." However, it is unclear whether this statement is a typographical error intended to read "speech therapy."

{¶16} It is from this judgment that Mother appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE JUDGMENT OF THE TRIAL COURT TO GRANT HANCOCK COUNTY JOB AND FAMILY SERVICES PERMANENT CUSTODY WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED BY NOT MAKING A FINDING ON THE RECORD AS TO THE WISHES OF THE CHILDREN [SIC] AND NOT APPOINTING THEM SEPARATE COUNSEL.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY FOR THE CHILD BECAUSE IT WAS NOT IN HIS BEST INTEREST.**

*Assignment of Error No. IV*

**THE TRIAL COURT'S FINDING OF ABANDONMENT IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.**

*Assignment of Error No. V*

**THE HANCOCK COUNTY JOB AND FAMILY SERVICES FAILED ITS DUTY TO USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS AND REUNIFICATION WITH THE PARENT.**

{¶17} Due to the nature of Mother's arguments, we elect to address her first and fourth assignments of error together, and her second and third assignments of error together, preceded by a discussion of the standard of review.

*Standard of Review*

{¶18} Our review of a grant of permanent custody begins by noting that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes* (1997), 79 Ohio St.3d 46, 48, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157. Parents have a fundamental liberty interest in the care, custody, and upbringing of their children. *Murray*, 52 Ohio St.3d at 157; *Santosky v. Kramer* (1982), 455 U.S. 745, 753. However, a natural parent's rights are not absolute. *In re Thomas*, 3d Dist. No. 5-03-08, 2003-Ohio-5885, ¶7. "It is plain that the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." *In re Cunningham* (1979), 59 Ohio St.2d 100, 106 (citation omitted).

{¶19} Permanent custody determinations made under R.C. 2151.414 must be supported by clear and convincing evidence. *In re Baby Girl Doe*, 149 Ohio App.3d 717, 2002-Ohio-4470, ¶89, citing *In re Hiatt* (1993), 86 Ohio App.3d 716, 725. Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere

preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes* (1986), 25 Ohio St.3d 101, 104. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, citing *Ford v. Osborne* (1887), 45 Ohio St. 1. Thus, we are required to determine whether the trial court's determination was supported by sufficient credible evidence to satisfy the requisite degree of proof, *In re McCann*, 12th Dist. No. CA2003-02-017, 2004-Ohio-283, ¶12, citing *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, ¶16, and, absent an abuse of discretion, the trial court's decision must be upheld. *In re Robison*, 3d Dist. No. 5-07-41, 2008-Ohio-516, ¶8, citing *Masters v. Masters* (1994), 69 Ohio St.3d 83, 85; see, also, *In re Rinaldi*, 3d Dist. No. 1-02-74, 2003-Ohio-2562, ¶17. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id.

*Assignments of Error Nos. I and IV*

**{¶20}** In her first assignment of error, Mother argues that the trial court's grant of custody to CPSU was contrary to the manifest weight of the evidence. Specifically, Mother contends that CPSU's evidence that Mother had not made efforts towards establishing a proper living environment for K.H. was contradicted by Mother's testimony that she found a stable housing environment and created support for K.H. In her fourth assignment of error, Mother argues that the trial court's finding of abandonment was not supported by clear and convincing evidence. Specifically, Mother argues that R.C. 2151.414(B)(1)(b), on which the trial court relied, only creates a *presumption* of abandonment, which may be rebutted by the parent. Mother contends that she sufficiently rebutted this presumption by presenting evidence that she had issues with transportation and limited resources. We disagree.

**{¶21}** "Once a child has been adjudicated dependent, neglected, or abused and temporary custody has been granted to a children services agency, the agency may file a motion for permanent custody[.]" *In re Esparza*, 3d Dist. Nos. 9-06-25, 9-06-27, 2007-Ohio-113, ¶25. The trial court's analysis consists of two prongs. First, the trial court must determine if any conditions enumerated in R.C. 2151.414(B)(1) are present. If any of these conditions exist, the trial court must

then move on to the second prong and determine whether permanent custody is in the best interest of the child.

{¶22} The first prong of analysis requires consideration of R.C. 2151.414(B)(1), which contains the pertinent conditions, and states, in part:

> **[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**

{¶23} Here, Mother essentially argues that the trial court abused its discretion in finding that the conditions in R.C. 2151.414(B)(1)(a) and (b) were both present, as she argues these findings were against the manifest weight of the evidence and unsupported by sufficient evidence. Initially, we will discuss Mother's argument pertaining to the condition in R.C. 2151.414(B)(1)(a), that "the

child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

**{¶24}** R.C. 2151.414(E) provides, in pertinent part:

**(E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**
**\* \* \***
**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**
**\* \* \***
**(10) The parent has abandoned the child.**

**{¶25}** Here, the trial court found that "many factors included in R.C. 2151.414(E)(1)-(16)" were present. (Jan. 2010 Judgment Entry, p. 3).

Specifically, the trial court made a finding that Mother failed continuously and repeatedly to substantially remedy the problems that initially caused K.H. to be placed outside of her home pursuant to R.C. 2151.414(E)(1), including that Mother had a total lack of involvement with K.H. and had not maintained regular visitation with him or even regular contact with the caseworker; that Mother had not met any of the case plan objectives including substance abuse and mental health treatment, parental education, and maintaining safe and stable housing; and, that Mother had not even demonstrated minimal efforts towards accomplishing the case plan objectives. In doing so, the trial court noted that it had considered Mother's lack of utilization of the social and rehabilitative services and material resources made available to her. Additionally, the trial court found that K.H. was abandoned pursuant to R.C. 2151.414(E)(10) because his father was unknown and Mother had not visited him for the seven months prior to the hearing.

{¶26} CPSU presented evidence at the hearing that Mother's caseworker had personally referred her for services for mental health, substance abuse treatment, life skills, home-based therapy, parenting skills, and visitation; that, despite these referrals, Mother never began mental health or substance abuse treatment, the life skills program, or parenting classes; that Mother had not visited with K.H. physically or by telephone since June 2009; that Mother's caseworker referred her to a transitional facility for job training and temporary housing, but

she did not follow through; that Mother failed to regularly inform her caseworker of her changes in address, even upon his request; and, that Mother did not complete any of the case plan objectives.

{¶27} Mother did present evidence that she did not visit K.H. even when she lived in Findlay because she had "transportation issues" and ran out of CPSU-provided bus tickets; however, she then testified on cross-examination that she did not inform CPSU of her transportation issues or ask her caseworker for help purchasing bus tickets. Further, testimony was heard from the caseworker that Mother also did not visit with K.H. via telephone or make contact with him by sending gifts. Additionally, Mother testified that she then moved to Dayton, although, incredibly, she testified that she did not believe this would affect her ability to visit K.H. Further, although Mother testified that the visitations were scheduled at a time when she was unable to access transportation, she admitted that she had not requested that CPSU change the visitations to a time when she could secure transportation. Mother additionally testified that she had attempted to create a safe and stable living environment by moving in with her boyfriend in Dayton; however, she also testified that she had not contacted CPSU so that they could evaluate the home. Finally, although Mother testified that she would love to take parenting classes and had been "calling around" in Dayton to find classes, she admitted that she had been calling around for three or four months, but had not

attended any classes. Based on the preceding, we do not find that the trial court's findings that K.H. could not or should not be placed with Mother within a reasonable time and that K.H. was abandoned were either against the manifest weight of the evidence or unsupported by sufficient evidence.

{¶28} Accordingly, we overrule Mother's first and fourth assignments of error.

*Assignments of Error Nos. II and III*

{¶29} In her second assignment of error, Mother argues that the trial court erred by failing to make a finding on the record as to K.H.'s wishes and failing to appoint K.H. separate counsel. Specifically, Mother argues that, although K.H. was only four years old at the time of the permanent custody hearing, the trial court should have inquired into his maturity level or ability to express his desires as to custody. Additionally, in her third assignment of error, Mother argues that the trial court's granting of custody to CPSU was not in K.H.'s best interest. Specifically, Mother argues that placement was not in K.H.'s best interest because the record demonstrated that the foster parents would not be able to adopt K.H., requiring him to eventually be moved to a different home.

{¶30} After finding that one of the R.C. 2151.414(B)(1) conditions is present, as the trial court did and we affirmed in our analysis of Mother's first and fourth assignments of error, the trial court must then move on to the second prong

of the analysis. In the second prong, the trial court must determine by clear and convincing evidence that a grant of permanent custody to the agency is in the child's best interest. In doing so, R.C. 2151.414(D)(1) directs the trial court to consider the following non-exclusive factors:

> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child * * ***
>
> **(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.] * * ***

**{¶31}** This Court has previously found that clear and convincing evidence did not support a trial court's finding that a child was too young to express her wishes and conclusion that permanent custody was in the child's best interest pursuant to R.C. 2151.414(D)(1)(b), where there was no testimony indicating what the child's wishes were regarding permanent custody; where the GAL report and testimony did not reference the child's wishes or indicate that the child lacked maturity to indicate her wishes; where there was no indication in the record that the trial court interviewed the child to ascertain her level of maturity; where the child was five years old; and, where there was no evidence on the record that the

-20-

child had developmental delays or lacked maturity to express her wishes. See *In re Lopez*, 166 Ohio App.3d 688, 2006-Ohio-2251.

{¶32} In contrast, this Court has previously found that clear and convincing evidence supported a trial court's finding that permanent custody was in the best interests of the children even though the GAL failed to question the children regarding their wishes and the trial court apparently failed to consider R.C. 2151.414(D)(1)(b), as this error was harmless in light of the circumstances that one child was nearly three years old, and the other child was nearly six years old; that evidence was presented that the children had possible developmental delays; that evidence was presented that the children lacked maturity; and, that overwhelming evidence supported the conclusion that permanent custody was in the children's best interests. See *In re Lane*, 3d Dist. Nos. 9-03-61, 9-03-62, 2004-Ohio-2798. Nevertheless, this Court noted that "[t]he trial court and/or the guardian ad litem would normally be well advised to more specifically address the wishes of the children." *Lane*, 2004-Ohio-2798, at ¶46.

{¶33} Here, Mother specifically argues that the trial court failed to make a finding on the record as to K.H.'s wishes and/or inquire into his ability to express his desires as to custody. However, the trial court's judgment entry specifically provided that it considered K.H.'s "wishes * * * by way of recommendation from his CASA." (Jan. 2010 Judgment Entry, p. 3). Additionally, the GAL report

submitted to the trial court provided that "[t]his child is only four years of age. * * * [K.H.] rarely spoke and never expressed himself during any of my visits with him. I believe the wishes of this child would be to remain with these foster care parents or to be placed into adoption with loving and caring adoptive parents or adoptive parent." (Report and Recommendations of CASA/GAL, p. 5).

{¶34} We find that this evidence is sufficient to demonstrate that the trial court considered K.H.'s wishes pursuant to R.C. 2151.414(D)(1)(b) and its corresponding finding that permanent custody was in his best interest. Further, we find that any possible error in the trial court's failure to specifically inquire into K.H.'s wishes and maturity was harmless. Similar to *Lane*, supra, the record demonstrated K.H. was of a young age, only four years old, and had developmental delays for which he received classes in speech, therapy,[4] social skills, and counseling. Additionally, we find this situation to be distinguishable from *Lopez*, supra, where the GAL report did not reference the child's wishes at all; where the child was five years old; and, where there was no evidence on the record that the child had developmental delays.

{¶35} Next, we turn to Mother's argument that the trial court erred in failing to appoint counsel on behalf of K.H. pursuant to *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500. In *Williams*, supra, the Supreme Court of Ohio held

---

[4] See Footnote 3.

that it may be necessary for a trial court to appoint independent counsel for a minor if his wishes contradict the recommendations of the GAL. We find that the *Williams* holding is inapplicable in the case sub judice. As discussed previously, K.H. was only four years of age, "rarely spoke," and "never expressed himself." There was no indication that K.H. had wishes concerning his custody that contradicted the recommendations of the GAL. See *In re C.E.*, 3d Dist. No. 5-09-02, 5-09-03, 2009-Ohio-6027, ¶21. Consequently, we do not find that the trial court erred in failing to appoint counsel on K.H.'s behalf.

{¶36} Accordingly, we overrule Mother's second assignment of error.

{¶37} Next, we turn to Mother's third assignment of error, which argues that the trial court's granting of custody to CPSU was not in K.H.'s best interest. Specifically, Mother argues that placement was not in K.H.'s best interest because the record demonstrated that the foster parents were not willing to adopt K.H., requiring him to eventually be moved to a different home.

{¶38} Here, the trial court's judgment entry specifically reflects that it considered all of the relevant factors in R.C. 2151.414(D)(1) through (5) and 2151.414(E)(7) to (11) in determining that granting permanent custody to CPSU was in K.H.'s best interest. The trial court further specified that it had considered K.H.'s lack of relationship with his parents and relatives; K.H.'s need for legally secure permanent placement; the unlikelihood of this type of placement without

granting permanent custody to CPSU; K.H.'s custodial history; and, K.H.'s desires as expressed through his GAL. Although Olthouse testified that K.H.'s current foster family would not adopt him, he nevertheless testified that K.H. had a high probability of being adopted. We cannot find that the likelihood that K.H. would be moved into another foster home before being adopted is a factor demonstrating that permanent custody was not in his best interest, particularly given his lack of relationship with Mother and his custodial history.

{¶39} Accordingly, we overrule Mother's third assignment of error.

*Assignment of Error No. V*

{¶40} In her fifth assignment of error, Mother contends that CPSU failed in its duty to provide reasonable case planning and diligent efforts to reunify her with K.H. Specifically, Mother argues that she was not given ample opportunity to complete the case plan; that less than eight months passed from the time CPSU obtained temporary custody until CPSU filed for permanent custody; that CPSU did nothing to address her transportation issues; that CPSU did not provide Mother with information about counseling and other services outside of the Hancock County area; that CPSU was not diligent in attempting to identify and locate K.H.'s biological father; and, that CPSU failed to conduct appropriate visits of the home to measure Mother's progress in creating a safe environment.

{¶41} "R.C. 2151.419 imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home." *In re Sorg*, 3d Dist. No. 5-02-03, 2002-Ohio-2725, ¶13, citing *In re Brown* (1994), 98 Ohio App.3d 337, 344. "The agency bears the burden of showing that it made such reasonable efforts." *Sorg*, 2002-Ohio-2725, at ¶13, citing R.C. 2151.419(A)(1).

{¶42} Initially, Mother argues that she was not given enough time to complete the case plan, as only eight months passed between K.H.'s removal from the home and CPSU's filing for permanent custody. However, Mother's argument ignores the fact that testimony at the hearing established she had not made significant progress in *any* case plan objective, and had not made *any* effort towards accomplishing the majority of the case plan objectives. Further, Olthouse, the parties' caseworker, testified that he did not believe a six-month extension of temporary custody would change Mother's compliance with the case plan. Finally, we note that Olthouse stressed K.H.'s need for permanency and emphasize again that, despite the natural rights of a parent, the ultimate welfare of the child is the controlling principle in a permanent custody case. See *Cunningham*, 59 Ohio St.2d at 106.

{¶43} Next, Mother argues that CPSU did nothing to address her transportation issues, insinuating that this was the cause of her failure to visit with

K.H. However, Mother admitted that Olthouse provided her with ten bus tickets, and that, when she ran out, she did not inform CPSU of her transportation issues or request that Olthouse provide her with more tickets. Additionally, Mother testified that, after moving to Dayton, her access to transportation was unavailable during the times that visitation was scheduled with K.H. in Findlay; however, she then admitted that she did not request CPSU to schedule the visitation at a time when she would have transportation. Finally, Olthouse testified that Mother had not only failed to visit K.H. in person since June 12, 2009, but that she had also failed to visit with him via telephone or send him gifts since that time.

{¶44} Next, Mother contends that CPSU was not diligent in attempting to identify and locate K.H.'s biological father. Initially, we note that it is questionable whether Mother has standing to make this argument on the biological father's behalf, as it pertains to the rights of a non-party. See *In re M.K.*, 10th Dist. No. 09AP-1141, 09AP-1142, 2010-Ohio-2194, ¶19, citing *In re A.C.,* 10th dist. No. 03AP-348, 2003-Ohio-5344, ¶7. See, also, *In re T.R.*, 5th Dist. No. 2009 CA 00235, 2010-Ohio-429, ¶¶27-28. Nevertheless, we find that, even if Mother had standing to raise this argument, testimony was heard that two men identified by Mother as possible fathers were given paternity tests; that Mother did not identify to CPSU any other men as K.H.'s possible father; that CPSU consulted the putative father registry; and, that K.H.'s unknown father was notified of the

proceedings via publication. Mother does not identify any other possible methods by which the trial court could have identified and located K.H.'s father, nor are any apparent to this Court.

**{¶45}** Finally, Mother argues that CPSU did not provide her with information about counseling and other services outside of the Hancock County area and failed to conduct home visits of her boyfriend's apartment to determine whether she had created an appropriate environment for K.H. However, Olthouse testified that, due to Mother's transient lifestyle, he requested that she inform him of any changes of address, which she did not do, and he was uncertain of where she was living from April through July 2009; that, in August 2009, he learned through the grandmother that Mother was living in Dayton, Ohio; that he left, at a minimum, monthly voice messages at the phone number provided to him by the grandmother; and, that Mother did not return his phone calls. Additionally, Mother admitted that she did not call CPSU to see if they could assist her with financing classes and services in Dayton; that she had not asked them to evaluate her boyfriend's apartment in Dayton to see if it was appropriate for K.H.; and, that she did not even inform CPSU of her Dayton address until after they filed for permanent custody.

**{¶46}** In light of the preceding, we do not find that CPSU failed in its duty to provide reasonable case planning and diligent efforts to reunify her with K.H.

**{¶47}** Accordingly, we overrule Mother's fifth assignment of error.

**{¶48}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**