[Cite as *In re H.M.*, 2014-Ohio-755.]

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
LOGAN COUNTY**

IN RE:

    H.M.,                                         CASE NO. 8-13-11

DEPENDENT CHILD.

  [MARLA LEWELLEN - APPELLANT].             O P I N I O N

IN RE:

    L.L.,                                          CASE NO. 8-13-12

DEPENDENT CHILD.

  [MARLA LEWELLEN - APPELLANT].             O P I N I O N

IN RE:

    J.L.,                                          CASE NO. 8-13-13

DEPENDENT CHILD.

  [MARLA LEWELLEN - APPELLANT].              O P I N I O N

**Appeals from Logan County Common Pleas Court
Trial Court Nos. 11-CS-0060, 11-CS-0061 and 11-CS-0067**

**Judgments Reversed and Causes Remanded**

**Date of Decision: March 3, 2014**

Case Nos. 8-13-11, 8-13-12, 8-13-13

**APPEARANCES:**

 *Alison Boggs* **for Appellant**

 *Deborah K. Brown* **for Appellee**

**ROGERS, J.**

 **{¶1}** Appellant, Marla Lewellan, appeals the judgment of the Court of Common Pleas of Logan County granting permanent custody of her three minor children, H.M., L.L., and J.L., to Logan County Children Services ("LCCS"). On appeal, Lewellan argues that the trial court erred by: entering a judgment that was against the manifest weight of the evidence; improperly focusing on Lewellan's mental health; and failing to make independent findings of fact and conclusions of law. Lewellan also argues that LCCS did not use reasonable efforts to reunify the family, that the guardian ad litem ("GAL") for her children did not adequately perform his duties; and that her GAL did not adequately perform his duties. For the reasons that follow, we reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion.

 **{¶2}** While this appeal concerns three separate cases, we will discuss their procedural histories together, as they are intertwined.

 **{¶3}** On March 26, 2011, LCCS received a referral regarding the care and well-being of two minor children: H.M. and L.L. Lewellan and her husband,

James Lewellan ("James"), father of L.L., entered into a Voluntary Case Plan with LCCS to rectify problems with the cleanliness of their home.  On September 1, 2011, the LCCS received another referral indicating that Lewellan had attacked H.M., stabbing her with a fork in the head and hand, believing she was a demon.

{¶4} On September 7, 2011, a Family Team Meeting was held where LCCS expressed its concerns for the safety of the children with Lewellan and James. Lewellan stated that she was eight months pregnant, and due to the pregnancy she had needed to stop taking her medicine for her mental health problems.  She also stated that she was under extreme stress, partially due to the involvement of LCCS through the Voluntary Case Plan, and she had been told by three different doctors that she was on the verge of a mental or nervous breakdown.  James stated that he had a temper, but that he thought it was under control.  As a result of the meeting, H.M. was voluntarily sent to stay with a relative, Nancy Losey[1], and L.L. was voluntarily sent to stay with his grandparents, Marlene and Ferlyn Butler.

{¶5} On September 8, 2011, LCCS filed a complaint in Case Nos. 11-CS-0060 and 11-CS-0061, alleging H.M. and L.L., respectively, to be dependent and neglected children.  On that same day, LCCS filed a motion for orders to grant temporary custody of H.M. to Losey and temporary custody of L.L. to LCCS. The

---

[1] Losey's father was married to the mother of Tim Lewellan, James' father.  James was placed in the custody of Losey when he was between eight and nine years old, returned to his parents for approximately nine months, and afterward was again placed in Losey's custody.  She considers him "one of [her] children." Jun. 19, 2013 Tr., p. 40.

trial court, upon its own motion, appointed attorney James Gudgel as both counsel and GAL for the children.  The trial court scheduled a hearing on the motion for temporary custody for September 23, 2011.

{¶6} Lewellan gave birth to J.L. in September of 2011.  LCCS filed a complaint on September 23, 2011, in Case No. 11-CS-0067, alleging J.L. to be a dependent child.  In its complaint, LCCS asserted that Lewellan's home was unsafe and unsanitary for a newborn, Lewellan would need time to readjust to her mental health medication, and that J.L. had been born premature and required treatment.  LCCS moved for orders to grant temporary custody of J.L. to LCCS and the court, on its own motion, appointed Gudgel as J.L.'s counsel and GAL.  Further, it scheduled the hearing on the motion for that day, September 23, to coincide with the hearing already scheduled for H.M. and L.L.  As a result of the hearing, Losey was granted temporary custody of H.M. and LCCS was granted temporary custody of both L.L. and J.L.

{¶7} On October 18, 2011, Lewellan and James reached an agreement with LCCS and stipulated that all three children were dependent.  As a result, the trial court, after a review of the record, found by clear and convincing evidence that all three children were dependent and dismissed the allegations that H.M. and L.L. were neglected.  On November 21, 2011, the day of the dispositional hearing, Gudgel filed a GAL report stating that he had reviewed the terms of the case plan

and found them to be in the best interests of the children while reunification, at that time, was not. The court ordered that Losey remain the temporary custodian of H.M. and that LCCS be granted protective supervision of H.M. and remain the temporary custodian of both L.L. and J.L. At two subsequent status hearings, where evidence was presented that inadequate progress had been made on the case plan, the court continued its previous orders.

{¶8} On June 13, 2012, LCCS moved the trial court to grant it temporary custody of H.M., as the placement with Losey was not intended to last beyond the end of the school year. At a hearing held on June 25, 2012, Lewellan agreed that LCCS should have temporary custody of H.M., and the motion was granted. At the children's annual review hearings, the trial granted an extension of temporary custody of the children to LCCS. In response to psychological evaluations of both Lewellan and James and out of concern that they did not fully comprehend the recommendations of the providers they were working with or how to be adequate parents, the court appointed them each a GAL.

{¶9} On December 12, 2012, LCCS moved for permanent custody of all three children. On June 17, 2013, Gudgel submitted his GAL report regarding the three minor children. In the report, Gudgel stated that the cleanliness of the house remained unsuitable for the children, visitations were chaotic and dysfunctional, and that the recent separation of Lewellan and James was a detriment to

reunification, as neither parent had demonstrated that they could adequately parent the children alone. Ultimately, Gudgel did not believe that reunification would be in the best interests of the children.

{¶10} The permanent custody hearing for all three children commenced on June 18, 2013. At the time, H.M. was nearly ten years old, L.L. was nearly six, and J.L. was nearly two. At the hearing, testimony was elicited that, when LCCS obtained custody of the children, H.M. was on an Individualized Education Program at school for ADHD, behavioral and impulsivity issues, and for some psychological issues related to sexual abuse. L.L. was on the autism spectrum, had some additional developmental delays including difficulty in understanding his speech, and had physical problems as a result of having muscular dystrophy. J.L. was typically developing, although he had some urinary tract problems.

{¶11} LCCS called the children's GAL, Gudgel, as a witness. Gudgel stated that over the course of his appointment he had met with the children and the parents. He further testified that "based on the documents and information that have been provided, my recommendation was permanent custody was in the children's best interest." Jun. 18, 2013 Tr., p. 41. On cross examination, Gudgel testified that he had never observed the parents interact with their children. Further, when asked whether he based his report "solely on the reports and

statements of the caseworker and other coaches and other sources," Gudgel replied "Correct." *Id.* at 42.

{¶12} Chris Christensen, the caseworker for the three children, also testified for LCCS. In regard to H.M., Christensen testified that she "is thriving academically. She is making more advances socially, within the environment. * * * I am not going to say she hasn't tested the boundaries of their rules and guidelines and restrictions. But she understands the boundaries that she can not [sic] cross, the zero tolerance things." *Id.* at 71. As to L.L., Christensen testified that he could speak more clearly, walk without the assistance of any device, and that "[h]e takes a whole lot of pride in his academics and wants to do well. Even with the developmental issues that he has, he has gotten to an age-appropriate level with being able to soak up a great level of information * * *. He has made strides with cognitive skills." *Id.* at 72-73. With regard to J.L., Christensen testified that he had no developmental delays.

{¶13} LCCS called Grace Schoessow, a licensed behavioral therapist contracted as a coach by LCCS to provide in-home training during visitations, as a witness. When asked whether the children had an appropriate and healthy relationship with their foster caregivers, she stated:

> A. Yes, he it [sic] does. Actually, this last visit, Marla handed [H.M.] the phone, and called. She handed her the phone and she talked to her sister, which would be [H.M.]'s aunt. [H.M.] expressed

she wants to live with the current foster parent.  So I know the kids are always happy to go with the foster parents.

*Id.* at 147.  When asked what she believed was in the best interests of the children, she stated that the children were "stable and well adjusted [sic] in their current situation."  *Id.* at 148.

{¶14} H.M.'s second grade teacher, Jill Walton-Cronkelton, testified as to H.M.'s attendance and behavioral problems, cleanliness issues, and academic delays while she was still in the care of Lewellan.  When asked what changes H.M. displayed after being removed, she responded:

> A:  Physical.  She came clean, her hair was always done.  She was so . . . she was so funny, because she was so happy.  She would say, "Don't I look cute today?"  "Don't you like my shirt?"  "Don't you like my new shoes?"  Just even the cleanliness and just the attention that she he [sic] got made her more confident.  She then was able to - - she socialized with kids.  They loved her.  She loved them.  It was a completely different situation than when she came at the beginning of the school year.
>
> Q:  Did her attendance improve?
>
> A:  Yes, she only had two absences in second grade.
>
> Q:  As a result of that, academically she obviously improved?
>
> A:  Um-hum.
>
> Q:  Self esteem improved?
>
> A:  Yes.
>
> Q:  Behaviors?  Did those improve?

A:   Yes.

Jun. 18, 2013 Tr., p. 180-181.

{¶15} After Walton-Cronkelton's testimony, LCCS called Krista Adelsberger, principal of H.M.'s school, as a witness. She testified as to the concerns many teachers had regarding H.M.'s attendance, behaviors, and cleanliness while she was still in Lewellan's custody. She also testified as to how much H.M. improved after being placed with Losey, academically, behaviorally, and socially.

{¶16} Anne Stuck, occupational therapist for both H.M. and L.L., was called as a witness by LCCS. She worked with the children both before and after they were removed from Lewellan's care. She testified that H.M. improved in both hygiene and personal demeanor after being removed, and that she put forth a better effort during her therapy sessions. In regard to any differences in L.L., she stated that his "[h]ygiene was much improved. Appropriate for his age. * * * As far as demeanor, no tantrums. I think maybe one tantrum since being placed in foster care. More verbal. More willing to attend to the task and complete things requested." Jun. 19, 2013 Hearing Tr., p. 22. When asked where his current developmental level was, she testified:

> He is close to being age appropriate. And most recent progress note, which was actually done in April, we conduct those every 12 weeks,

he has met all but 3 age appropriate tasks.  One of them I haven't addressed at all.  This is for a patient 5 to 6 years old.  Then his scissors skills, he is just not as detail-oriented with cutting out.  But as far as writing and shapes and that type of thing, is he [sic] age appropriate.

*Id.* at 25.

**{¶17}** Losey also testified for LCCS.  When asked to describe the changes in H.M. from before she was placed in her care, Losey stated:

She was clean.  Mrs. [Walton-]Cronkelton said after 3 weeks from when I had her, she couldn't believe of the difference.  She had a bed time.  She had an up time.  Very structured.  Behavior completely stopped.  She could interact with other kids.  We got her off of stool softeners, no problem since.  Just a very happy kid.  Jumping on the trampoline.  Able to be outside.

*Id.* at 43.  Rebecca Ann Clark, H.M.'s foster parent at the time of the hearing, testified that H.M. came to live with her and her husband on September 6, 2012.  When asked by LCCS whether there were any current behavioral issues, the following exchange took place:

A:  She has her ups an [sic] downs.  But nothing out of the ordinary.  Her therapist said the issues we talk about are typical of a child her age.

Q:  Does she know what is going on with respect to these proceedings?

A:  She does.

Q:  You don't want to keep her out of the loop since this is her life?

A: It is. She is old enough. She, we have not given her everything. But she knew at some point there was going to be a hearing and a judge was going to decide what was best for her and how she would go through life.

*Id.* at 54. On cross-examination, when asked whether H.M. was told that she might not be able to go home to her mother, Clark responded "[w]e told her we didn't know what was going on. At some point she was either going to go home or she was not going to go home. We told her if she didn't go home, it might not necessarily be with us. We can't say for sure what is going to happen to her." *Id.* at 57.

{¶18} L.L.'s and J.L.'s current foster parents, Ashley Day and Angela Moeller, were the last witnesses called by LCCS. As to L.L., Day stated that "[h]e is more mobile. He is talking now. He is potty trained. He is more independent. He dresses himself. He can get his own cereal." *Id.* at 68. When asked about whether the children displayed any behaviors, she testified "[t]hey can be typical kids. There is some sibling rivalry going on. Typical kid stuff." *Id.* at 70. She also reiterated that J.L. had no developmental delays. Day and Moeller both testified that they believed it to be in the children's best interest to have permanent custody granted to LCCS.

{¶19} After LCCS rested, Lewellan called her father, Ferlyn Butler, to testify. When asked whether he had any concerns regarding the children being

returned to their mother, he replied "[n]o. The kids loved their - - like the boys they would - - [L.L.] was always hugging on her. *Mama! Mama!* The boys really love their mom. And [H.M.], she would hug around on her mom and stuff too. She says, 'I will just be glad when I get home.' " (Emphasis sic.) *Id.* at 79.

{¶20} At the conclusion of the evidence the court found that permanent custody was in the best interests of all three children. The court did not orally state its findings on the record, and instead directed "the Prosecutor to prepare the judgment entry." Jun. 21, 2013 Tr., p. 11. Further, the court stated:

> And see if you can live with, because I would certainly allow you to critically analyze her proposed judgment entry. I am not going to assign [sic] it until I get input from all of you.
> So for me, [making oral findings] is not necessary. I suppose based upon - - does anybody else think that? I don't want to short shift [sic] anybody. * * *
> I also thought in my looking at mom and dad here today, I would almost find that to be cruel. I suppose to review some of those things.
> I know we are here in a court of record and we say things on the Record. But all of you heard those things too.
> If [the Prosecutor] proposes anything, a finding of fact or a reference to a particular statute sub division in 2151, I am sure you will call it to the Court's attention.
> If we have to have one other meeting of all other counsel to discuss this and hash it out, we will. This is an important matter for James and [Lewellan], but also for the kids. I can certainly schedule that.

*Id.* at 11-12. The court filed its judgment entry stating findings of fact and conclusion of law on July 8, 2013, granting permanent custody of all three children to LCCS.

**{¶21}** Lewellan timely filed her appeal, presenting the following assignments of error for our review.

### Assignment of Error No. I

**THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. APPELLEE DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE COURT SHOULD GRANT ITS MOTION FOR PERMANENT CUSTODY OF THE MINOR CHILDREN.**

### Assignment of Error No. II

**THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR PERMANENT CUSTODY WHEN IT PRIMARILY FOCUSED ON APPELLANT'S MENTAL HEALTH AND RELIED ON THAT AS THE BASIS FOR DEPRIVING APPELLANT CUSTODY OF HER MINOR CHILDREN.**

### Assignment of Error No. III

**THE TRIAL COURT ERRED IN FINDING APPELLEE USED REASONABLE EFFORTS FOR REUNIFICATION THROUGHOUT THE CASE**

### Assignment of Error No. IV

**THE CHILDREN'S GUARDIAN AD LITEM FAILED TO PERFORM NECESSARY DUTIES PURSUANT TO OHIO REVISED CODE SECTION 2151.281 AND SUPERINDENT [sic] RULE 48, THEREBY NOT ACTING IN THE**

**CHILDREN'S BEST INTEREST, TO APPELLANT'S DETRIMENT AND IN VIOLATION OF HER DUE PROCESS.**

*Assignment of Error No. V*

**APPELLANT'S COURT APPOINTED GUARDIAN AD LITEM FAILED TO PERFORM HIS DUTIES TO APPELLANT'S DETRIMENT AND IN VIOLATION OF HER DUE PROCESS.**

*Assignment of Error No. VI*

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO PUT ITS FINDINGS OF FACT AND CONCLUSIONS OF LAW ON THE RECORD BY DIRECTING APPELLEE TO DRAFT THE JUDGMENT ENTRY BASED ON HER PERCEIVED FINDINGS AND CONCLUSIONS AND NOT THE COURT'S INDEPENDENAT REVIEW OF THE EVIDENCE PRESENTED AT THE PERMANENT CUSTODY HEARING.**

{¶22} Due to the nature of the assignments of error, we elect to address them out of order, and address first and fourth assignments of error together.

*Assignments of Error Nos. I & IV*

{¶23} In her first and fourth assignments of error, Lewellan argues that the trial court erred in granting permanent custody of her children to LCCS. Specifically, she argues that the trial court's failure to investigate the wishes of the children, coupled with the failure of the children's GAL to investigate and express their wishes, either through testimony or a report, constitutes reversible error. We agree.

*Standard of Review*

**{¶24}** When reviewing a grant of permanent custody, we note that "the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990). Parents have a fundamental interest in the "care, custody, and upbringing of their children." *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 50. Therefore, the parents must be given "every procedural and substantive protection the law allows." *Hayes* at 157. However, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). But, as this court has noted, " 'the termination of parental rights is an alternative of last resort.' " *In re Lopez*, 166 Ohio App.3d 688, 2006-Ohio-2251, ¶ 25 (3d Dist.), quoting *In re Capasso*, 3d Dist. Hancock Nos. 5-04-36, 5-04-37, 5-04-38, and 5-04-39, 2005-Ohio-1601, ¶ 6.

**{¶25}** Under R.C. 2151.414, permanent custody determinations must be supported by clear and convincing evidence. *In re A.F.* at ¶ 51. Clear and convincing evidence has been defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere

-15-

preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986). In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Thus, we are required to determine whether the trial court's determination was supported by sufficient credible evidence to satisfy the requisite degree of proof. *In re McCann*, 12th Dist. Clermont No. CA2003-02-017, 2004-Ohio-283, ¶ 12.

{¶26} In applying this standard of review, we note that trial courts are vested with broad discretion in determining parental rights. *Blaker v. Wilhelm*, 6th Dist. Wood No. WD-04-003, 2005-Ohio-317, ¶ 9. We may not simply substitute our own judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Therefore, absent an abuse of discretion, "a trial court's decision regarding the allocation of parental rights and responsibilities for a minor child must be upheld." *In re Franklin*, 3d Dist. Marion Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, ¶ 10. An abuse of discretion occurs when a trial court's decision "is contrary to law, unreasonable, not supported by the evidence, or grossly

unsound." *In re B.C.*, 191 Ohio App.3d 739, 2010-Ohio-6377, ¶ 16 (3d Dist.), citing *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 16-18 (2d Dist.).

*Best Interests of H.M, J.L., & L.L*

{¶27} In determining whether permanent custody is in the best interest of a child, a trial court needs to consider all relevant factors, including but not limited to, the five listed under R.C. 2151.414(D). These factors include, "the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; the wishes of the child; the custodial history of the child; the child's need for legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[;]" and whether any of the factors in division (E)(7)-(11) apply to the child. *In re B.S.*, 184 Ohio App.3d 463, 2009-Ohio-5497, ¶ 46 (8th Dist.); R.C. 2151.414(D).

{¶28} A trial court can determine that granting permanent custody to the state is in the child's best interest, even with a lack of clear and convincing evidence in a single factor. *In re Schaeffer Children*, 85 Ohio App.3d 683, 392 (3d Dist. 1993). However, each of the factors must be addressed by the trial court in its findings, or by some indication in the record. *In re D.H.*, 3d Dist. Marion No. 9-06-57, 2007-Ohio-1762, ¶ 21. Further, it is not the prerogative of the appellate court "to review the factual record or narrative and then make the

necessary inferences to determine whether the trial court must have considered each of the required statutory factors." *Id.* at ¶ 20. Instead, the judgment entry must identify the clear and convincing evidence that supports a finding that each factor was considered. *See id.; see also In re McMillin*, 171 Ohio App.3d 686, 2007-Ohio-2046, ¶ 14-15, (3d Dist.).

**{¶29}** R.C. 2151.414(D)(1)(b) requires that when a court determines the best interests of a child it considers that child's wishes.[2] These wishes must be "expressed directly by the child or through the child's GAL, with due regard for the maturity of the child." *Id.* Thus, trial courts are limited, when investigating the wishes of the child, to the testimony of the GAL or the child, and may not consider testimony from other sources. *In re T.V.*, 10th Dist. Franklin Nos. 04AP-1159, 04AP-1160, 2005-Ohio-4280, ¶ 60; *In re Walling*, 1st Dist. Hamilton No. C-050646, 2006-Ohio-810, ¶ 23.

**{¶30}** This court has made clear the importance of ascertaining the wishes of the child, encouraging both courts and GALs to specifically address the issue. *See In re Lane*, 3d Dist. Marion Nos. 9-03-61, 9-03-62, 2004-Ohio-2798, ¶ 46.

---

[2] The importance of this determination cannot be understated, as it implicates whether a GAL can also serve as the child's attorney. The Ohio Supreme Court has found that a child who is the subject of a permanent custody hearing "is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, syllabus. As a result, where the wishes of the child conflict with the disposition recommended by a GAL who is also serving in the role of attorney, independent counsel should be appointed by the court. *See id.* at ¶ 18, 29 (affirming court of appeals opinion stating same). Though not argued as an assignment of error, we note that without determining the wishes of the children, the court could not determine whether the children required independent counsel in this case.

There must be clear and convincing evidence on the record that there was investigation into to the wishes of the child to support a finding that the trial court considered the children's wishes. *See In re Lopez*, 2006-Ohio-2251, at ¶ 24, 37; *see also T.V.* at ¶ 61.

{¶31} Evidence that adequate investigation was made of the child's wishes can come from the GAL's report. *See In re K.H.*, 3d Dist. Hancock No. 5-10-06, 2010-Ohio-3801, ¶ 33-34. In *K.H.*, the judgment entry of the court after the permanent custody hearing stated that it considered the wishes of the children as expressed by the GAL. *Id.* at ¶ 33. The GAL's report stated that the child was only four and was unable to speak during visits with the guardian. *Id.* The report also stated that it was the guardian's belief that, if the child were able to express his wishes, they would be to stay in the foster placement. *Id.* This court found that this report provided sufficient evidence that the trial court considered the wishes of the child. *Id.*

{¶32} The trial court, on its own, can find that a child is too immature to express his or her wishes, so long as that finding is supported in the record. *Lopez*, 2006-Ohio-2251, at ¶ 38. In *Lopez*, the trial court found that the four children that were subject to the proceeding were too young to express their wishes and "noted that the children had special needs due to developmental delays and sexual abuse." *Id.* at ¶ 34. At the hearing, there was no testimony as to the children's wishes, nor

was there any indication in the GAL report that he attempted to investigate those wishes.  *Id.* at ¶ 36.  As evidence was presented regarding specific delays for three of the children, all under the age of four, this court found that the trial court's determination that the children were too young to express their wishes was supported on the record.  *Id*. at ¶ 38.  However, for the five year old daughter, there was nothing in the record regarding any kind of delay or any investigation into her maturity.  *Id.* at 37.  As a result, the trial court's finding that she was too young to express her wishes was not supported by clear and convincing evidence, resulting in a reversal of a grant of permanent custody to the state agency.  *Id.*

{¶33} In the case sub judice, the children did not testify, nor did the GAL testify, regarding their wishes or lack of maturity.  At the hearing, the trial court did not orally make any findings, reasoning it would be cruel to the parents.  In its judgment entry, the trial court, when listing how it considered the wishes of the children, stated:

> Attorney James R. Gudgel, Legal Counsel and Guardian Ad Litem for the minor children, has recommended the Court grant the Motion for Permanent Custody filed by Logan County Children Services. Further, based upon the testimony of Grace Schoessow, the minor child, H.M. (Female) has indicated she desires to stay with [her foster parents].

(8-13-11 & 8-13-12 Docket No. 176, p. 19[3]; 8-13-13 Docket No. 207, p. 19). The trial court did not make any finding that the children were too immature to express their wishes, in essence relying on the testimony of Grace Schoessaw and the report of the GAL as an expression of those wishes.

{¶34} While Schoessaw testified that she heard H.M. state that she wanted to stay with her foster parents while on the phone with her aunt, her grandfather, Feryln Butler, testified that he heard her tell her mother that she wanted to come home. Neither Schoessaw nor Butler are H.M.'s GAL. As a result, their statements cannot form the basis of the trial court's consideration of H.M.'s wishes, as R.C. 2151.414(D)(1)(b) requires that the child's wishes be expressed either directly or through a GAL.

{¶35} As to the GAL, Gudgel did not testify as to the wishes of the children or discuss how their immaturity or developmental delays might have prevented him from ascertaining those wishes. Further, unlike the facts in *K.H.*, the report here contained no mention of the wishes of the children or why those wishes could not be ascertained. In fact, in our review of the record, there is evidence that the children may have been mature enough to express their wishes.

{¶36} While J.L. was not yet two at the time of the hearing, all of the evidence presented was that he was typically developing. There was evidence that

---

[3] The Docket for 8-13-11 and 8-13-12 was combined.

L.L., who was almost six, had delays when temporary custody was granted to LCCS. However, the testimony adduced at trial continually stated that he had made great strides, both developmentally and cognitively. Of particular note was the testimony of Chris Christensen, who stated how far he had come cognitively, and Anne Stuck, who described how he had only missed three age appropriate markers. As to H.M., who was almost ten, ample testimony was given as to how close she was to developmental appropriateness. Her teachers and principal testified as to how much she had matured and changed since being removed from her parents. She was more social, had made large academic leaps, and her behavior had come under control. Further, her foster parents testified that she understood what the proceedings were going to determine: whether she would ever be allowed to return home. In spite of all of this, the report failed to state why Gudgel never asked the children their wishes.

{¶37} Further, unlike *Lopez*, the trial court did not find that the children were too immature to be able to express their wishes. It failed to find any reason why the children could not express their wishes. This is especially troubling in regard to H.M., as her foster parents testified that she understood that the result of the trial may be that she would never go home again. The court had evidence that at least one of the children had the cognitive capacity to understand the results of the proceedings, but never inquired as to what the child wanted that result to be.

{¶38} Here, the trial court failed to investigate the wishes of the children, or investigate whether the children could express those wishes.  In light of the ample evidence from providers, foster parents and teachers that J.L. was typically developing, L.L. had made large strides cognitively, physically, academically, and behaviorally, and in light of H.M.'s age, understanding of the proceedings, and great strides socially and behaviorally, we cannot say that there is clear and convincing evidence that the children were incapable of expressing those wishes.

{¶39} This court understands how important permanent placement is for each child, and how those interests are paramount, even over the interests of the parents.  Both trial courts and GALs must be diligent in investigating the wishes of the children during permanent custody proceedings.  Without any evidence on the record that the trial court or GAL investigated those wishes, under the facts of this case, we cannot find that the trial court adequately considered the wishes of the children as statutorily required.

{¶40} Accordingly, Lewellan's first and fourth assignments of error are sustained.

### Assignment of Error No. VI

{¶41} In her sixth assignment of error, Lewellan argues that the trial court improperly accepted LCCS's findings of fact and conclusions of law as its own. We agree.

**{¶42}** Trial courts are allowed to accept the proposed findings of fact and conclusions of law of a party. *New Haven Corner Carry Out, Inc. v. Clay Distrib. Co.*, 3d Dist. No. 13-01-30, 2002-Ohio-2726, ¶ 26. The trial court must thoroughly review the document and ensure that it is accurate. *Clark v. Smith*, 130 Ohio App.3d 648, 659 (3d Dist. 1998). Harmless error occurs when a court accepts proposed findings of fact and conclusions of law that include minor mistakes that do not prejudice a party. *See id.*, *see also New Haven* at ¶ 29. However, if the law or facts are unsupported and cause prejudice, the trial court was in error to accept them. *See Clark* at 659. The accuracy of the findings of fact and conclusions of law are reviewed under manifest weight. *New Haven* at ¶ 26.

**{¶43}** As we have already discussed, the finding that the court considered the wishes of the children is against the manifest weight of the evidence. As a result, accepting the proposed finding by LCCS that the court considered the wishes of the children was also in error.

**{¶44}** Therefore, Lewellan's sixth assignment of error is sustained.

### *Assignments of Error Nos. II, III, & V*

**{¶45}** In Lewellan's second, third, and fifth assignments of error, she argues that the trial court improperly focused on her mental health, LCCS did not expend reasonable efforts toward reunification, and her own guardian failed to

adequately perform his duties. Having found error prejudicial to Lewellan in the resolution of her first, fourth, and sixth assignments of error, the remaining assignments of error are moot and we elect not to address them. App.R. 12(A)(1)(c).

{¶46} Having found error prejudicial to Lewellan in her first, fourth, and sixth assignments of error, we reverse the judgments of the trial court and remand this matter for further proceedings consistent with this opinion.

*Judgments Reversed and*
*Causes Remanded*

**WILLAMOWSKI, P.J., concurs.**
**PRESTON, J., concurs in Judgment Only.**

**/jlr**